[No. S038530. Apr. 24, 1995.]

ARCHIE TOBE et al., Plaintiffs and Appellants, v.
CITY OF SANTA ANA et al., Defendants and Respondents.

DAWN ZUCKERNICK et al., Petitioners, v.
THE MUNICIPAL COURT FOR THE CENTRAL ORANGE JUDICIAL
DISTRICT OF ORANGE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Robert J. Cohen, Crystal C. Sims, William Wise, Harry Simon, Kim Savage, Gill Deford, Lloyd A. Charton, Ivette Pena, Richard A. Rothschild, John E. Huerta, Gary Blasi, Robin S. Toma, Cathy Jensen, Paul L. Hoffman, Mark Rosenbaum, Scott Wylie, Christopher B. Mears, Schiff, Hardin & Waite, Michael L. Brody and Lisa A. Dunsky for Plaintiffs and Appellants.

Janet Reno, United States Attorney General, Deval L. Patrick, United States Assistant Attorney General, Jessica Dunsay Silver, Thomas E. Chandler, Munger, Tolles & Olson, Jeffrey L. Bleich, Jonathan E. Altman, Michael R. Doyen, Susan R. Szabo, Inez D. Hope, Pamel A. Mohr, Maria Foscarinis, Jenner & Block, Carl S. Nadler, Thomas J. Perrelli, Blumenfeld & Cohen and Glenn B. Manishin as Amici Curiae on behalf of Plaintiffs and Appellants.

Edward J. Cooper, City Attorney, and Robert J. Wheeler, Assistant City Attorney, for Defendants and Respondents.

Louise H. Renne, City Attorney (San Francisco), Linda M. Ross and Michael E. Olsen, Deputy City Attorneys, Ronald A. Zumbrun, Anthony T. Caso, John G. Schmidt, Jr., Robert Teir, Michael J. Schroeder, Wilmer, Cutler & Pickering, Andrew N. Vollmer and Thomas Clark as Amici Curiae on behalf of Defendants and Respondents.

Ronald Y. Butler, Public Defender, Carl C. Holmes, Chief Deputy Public Defender, Thomas Havlena and Kevin J. Phillips, Deputy Public Defenders, for Petitioners.

O'Melveny & Myers, Phillip R. Kaplan, Brett J. Williamson, John C. Hueston and Linda A. Bagley as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Michael R. Capizzi, District Attorney, Maurice L. Evans, Chief Assistant District Attorney, Wallace J. Wade, Assistant District Attorney, Kathleen M. Harper, David L. Himelson and E. Thomas Dunn, Jr., Deputy District Attorneys, for Real Party in Intererst.

Kent S. Scheidegger as Amicus Curiae on behalf of Real Party in Interest.

OPINION

**BAXTER, J.**—The Court of Appeal invalidated, on constitutional grounds, an ordinance of the City of Santa Ana (Santa Ana) which banned "camping" and storage of personal property, including camping equipment, in designated public areas. We granted the petitions for review of Santa Ana and the People to consider whether the ordinance is valid on its face and whether either of the actions involved in the consolidated appeal stated an "as applied" challenge to the ordinance.

We conclude only a facial challenge was perfected in the lower courts and that the Santa Ana ordinance is valid on its face. It does not impermissibly restrict the right to travel, does not permit punishment for status, and is not unconstitutionally vague or overbroad, the only constitutional claims pursued by plaintiffs.[1]

We shall, therefore, reverse the judgment of the Court of Appeal.

I

BACKGROUND

In October 1992, Santa Ana added article VIII, section 10-400 et seq. (the ordinance) to its municipal code. The declared purpose of the ordinance was

---

[1]The Tobe petition for writ of mandate stated a cause of action based on an alleged violation of equal protection. The petition alleged in support of the equal protection claim only that the respondents had not and would not arrest nonhomeless persons who engaged in the same conduct for which the plaintiffs had been arrested. They offered no evidence to support that equal protection theory and did not argue an equal protection claim in the Court of Appeal or in this court. We deem that claim to have been abandoned. The Zuckernick petition did not make an equal protection claim.

to maintain public streets and other public areas in the city in a clean and accessible condition. Camping and storage of personal property in those areas, the ordinance recited, interfered with the rights of others to use those areas for the purposes for which they were intended.

The ordinance provides:

"Sec. 10-402. Unlawful Camping.

"It shall be unlawful for any person to camp, occupy camp facilities or use camp paraphernalia in the following areas, except as otherwise provided:

"(a) any street;

"(b) any public parking lot or public area, improved or unimproved.

"Sec. 10-403. Storage of Personal Property in Public Places.

"It shall be unlawful for any person to store personal property, including camp facilities and camp paraphernalia, in the following areas, except as otherwise provided by resolution of the City Council:

"(a) any park;

"(b) any street;

"(c) any public parking lot or public area, improved or unimproved."[2]

Plaintiffs in these consolidated actions[3] are: (1) homeless persons and taxpayers who appealed from a superior court order which struck "to live

---

[2] Section 10-401 of the ordinance defines the terms:

"(a) *Camp* means to pitch or occupy camp facilities; to use camp paraphernalia.

"(b) *Camp facilities* include, but are not limited to, tents, huts, or temporary shelters.

"(c) *Camp paraphernalia* includes, but is not limited to, tarpaulins, cots, beds, sleeping bags, hammocks or non-city designated cooking facilities and similar equipment.

"(d) *Park* means the same as defined in section 31-1 of this Code.

"(e) *Store* means to put aside or accumulate for use when needed, to put for safekeeping, to place or leave in a location.

"(f) *Street* means the same as defined in section 1-2 of this Code."

[3] The Court of Appeal opinion recites that the appeal and the mandate petition had been consolidated. We find no order in the record consolidating the appeal of the Tobe parties and the mandate petition of the Zuckernick parties in that court, however. We deem the recital in the Court of Appeal opinion to be such an order.

temporarily in a camp facility or outdoors" from the ordinance,[4] but otherwise denied their petition for writ of mandate by which they sought to bar enforcement of the ordinance (Tobe),[5] and (2) persons who, having been charged with violating the ordinance, demurred unsuccessfully to the complaints and thereafter sought mandate to compel the respondent municipal court to sustain their demurrers (Zuckernick).

Plaintiffs offered evidence to demonstrate that the ordinance was the culmination of a four-year effort by Santa Ana to expel homeless persons. There was evidence that in 1988 a policy was developed to show "vagrants" that they were not welcome in the city. To force them out, they were to be continually moved from locations they frequented by a task force from the city's police and recreation and parks departments; early park closing times were to be posted and strictly enforced; sleeping bags and accessories were to be disposed of; and abandoned shopping carts were to be confiscated. Providers of free food were to be monitored; sprinklers in the Center Park were to be turned on often; and violations of the city code by businesses and social service agencies in that area were to be strictly enforced. This effort led to a lawsuit which the city settled in April 1990.

Santa Ana then launched an August 15, 1990, sweep of the civic center area arresting and holding violators for offenses which included blocking passageways, drinking in public, urinating in public, jaywalking, destroying vegetation, riding bicycles on the sidewalk, glue sniffing, removing trash from a bin, and violating the fire code. Some conduct involved nothing more than dropping a match, leaf, or piece of paper, or jaywalking. The arrestees were handcuffed and taken to an athletic field where they were booked, chained to benches, marked with numbers, and held for up to six hours, after which they were released at a different location. Homeless persons among the arrestees claimed they were the victims of discriminatory enforcement. The municipal court found that they had been singled out for arrest for offenses that rarely, if ever, were the basis for even a citation.

In October 1990, Santa Ana settled a civil action for injunctive relief, agreeing to refrain from discriminating on the basis of homelessness, from taking action to drive the homeless out of the city, and from conducting

---

[4]The ordinance has been amended accordingly. That action is not disputed by the parties.

[5]Although the Tobe petition is denominated a petition for writ of "Mandate/Prohibition," prohibition lies only to restrain "the proceedings of any tribunal, corporation, board, or person exercising judicial functions, when such proceedings are without or in excess of the jurisdiction of such tribunal, corporation, board, or person." (Code Civ. Proc., § 1102.) None of the named respondents exercises judicial functions in the enforcement of the ordinance. We consider the petition one for mandamus alone therefore. (*Neal* v. *State of California* (1960) 55 Cal.2d 11, 16 [9 Cal.Rptr. 607, 357 P.2d 839].)

future sweeps and mass arrests. That case, which was to be dismissed in 1995, was still pending when the camping ordinance was passed in 1992.

Evidence in the form of declarations regarding the number of homeless and facilities for them was also offered. In 1993 there were from 10,000 to 12,000 homeless persons in Orange County and 975 permanent beds available to them. When National Guard armories opened in cold weather, there were 125 additional beds in Santa Ana and another 125 in Fullerton. On any given night, however, the number of shelter beds available was more than 2,500 less than the need.

The Court of Appeal majority, relying in part on this evidence, concluded that the purpose of the ordinance—to displace the homeless—was apparent. On that basis, it held that the ordinance infringed on the right to travel, authorized cruel and unusual punishment by criminalizing status, and was vague and overbroad. The city contends that the ordinance is constitutional on its face. We agree. We also conclude that, if the Tobe petition sought to mount an as applied challenge to the ordinance, it failed to perfect that type of challenge.

## II

### PRELIMINARY CONSIDERATIONS

A. *Facial or As Applied Challenge.*

 Plaintiffs argue that they have mounted an as applied challenge to the ordinance as well as a facial challenge. While they may have intended both, we conclude that no as applied challenge to the ordinance was perfected. The procedural posture of the Zuckernick action precludes an as applied challenge, which may not be made on demurrer to a complaint which does not describe the allegedly unlawful conduct or the circumstances in which it occurred. The Tobe plaintiffs did not clearly allege such a challenge or seek relief from specific allegedly impermissible applications of the ordinance. Moreover, assuming that an as applied attack on the ordinance was stated, the plaintiffs did not establish that the ordinance has been applied in a constitutionally impermissible manner either to themselves or to others in the past.

Because the Court of Appeal appears to have based its decision in part on reasoning that would be appropriate to a constitutional challenge based on a claim that, as applied to particular defendants, the Santa Ana ordinance was invalid, we must first consider the nature of the challenge made by these petitioners.

■ A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual. (*Dillon* v. *Municipal Court* (1971) 4 Cal.3d 860, 865 [94 Cal.Rptr. 777, 484 P.2d 945].) " 'To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.' " (*Arcadia Unified School Dist.* v. *State Dept. of Education* (1992) 2 Cal.4th 251, 267 [5 Cal.Rptr.2d 545, 825 P.2d 438], quoting *Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168, 180-181 [172 Cal.Rptr. 487, 624 P.2d 1215].)

An as applied challenge may seek (1) relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied, or (2) an injunction against future application of the statute or ordinance in the allegedly impermissible manner it is shown to have been applied in the past. It contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute or ordinance has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right. (See, e.g., *Broadrick* v. *Oklahoma* (1973) 413 U.S. 601, 615-616 [37 L.Ed.2d 830, 841-843, 93 S.Ct. 2908]; *County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662, 672 [114 Cal.Rptr. 345, 522 P.2d 1345]; *In re Marriage of Siller* (1986) 187 Cal.App.3d 36, 49 [231 Cal.Rptr. 757].) ■ When a criminal defendant claims that a facially valid statute or ordinance has been applied in a constitutionally impermissible manner to the defendant, the court evaluates the propriety of the application on a case-by-case basis to determine whether to relieve the defendant of the sanction. (*Hale* v. *Morgan* (1978) 22 Cal.3d 388, 404 [149 Cal.Rptr. 375, 584 P.2d 512].)

■ If a plaintiff seeks to enjoin future, allegedly impermissible, types of applications of a facially valid statute or ordinance, the plaintiff must demonstrate that such application is occurring or has occurred in the past. In *Bowen* v. *Kendrick* (1988) 487 U.S. 589 [101 L.Ed.2d 520, 108 S.Ct. 2562], for instance, the court first distinguished the nature of facial and as applied challenges to a statute which authorized federal grants to organizations for services related to premarital adolescent sexual relations and pregnancy. The plaintiffs had standing as taxpayers to raise an establishment clause challenge to the statute and to its application. The Supreme Court held that the as

applied challenge could be resolved only by considering how the statute was being administered. Plaintiffs had to show that specific grants were impermissible because the grants went to " 'pervasively sectarian' religious institutions" or had been used to fund " 'specifically religious activit[ies].' " (487 U.S. at p. 621 [101 L.Ed.2d at pp. 548-549].) The matter was remanded because the district court had not identified the particular grantees or the particular aspects of their programs for which constitutionally improper expenditures had been made. Finally, the court held, a remedy should be fashioned to withdraw federal agency approval of such grants.

■ When a criminal defendant seeks relief from a present application of a criminal statute or ordinance on constitutional grounds, it is not the administrative agency's "application" of the statute that is determinative, however. Whether the particular application of a statute declaring conduct criminal is constitutionally permissible can be determined only after the circumstances of its application have been established by conviction or otherwise. (See, e.g., *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286 [124 Cal.Rptr. 204, 540 P.2d 44].) Only then is an as applied challenge ripe. To obtain mandate or other relief from penalties imposed under a past application of the law, the defendant must presently be suffering some adverse impact of the law which the court has the power to redress.

■ If instead it is contended that an otherwise valid statute has been applied in a constitutionally impermissible manner in the past and the plaintiff seeks an injunction against future application of the statute in that manner, the plaintiff must show a pattern of impermissible enforcement. (See, e.g., *Van Atta* v. *Scott* (1980) 27 Cal.3d 424 [166 Cal.Rptr. 149, 613 P.2d 210]; *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222]; *Wirin* v. *Horrall* (1948) 85 Cal.App.2d 497 [193 P.2d 470]; cf. *Sundance* v. *Municipal Court* (1986) 42 Cal.3d 1101 [232 Cal.Rptr. 814, 729 P.2d 80].)

■ In most cases a plaintiff seeking this relief, either by a petition for writ of mandamus or complaint for declaratory and injunctive relief, must have a sufficient beneficial interest to have standing to prosecute the action, and there must be a present impermissible application of the challenged statute or ordinance which the court can remedy. ■ "[Code of Civil Procedure] [s]ection 1086 expresses the controlling statutory requirements for standing for mandate: 'The writ must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law. It must be issued upon the verified petition of the party beneficially interested.' The requirement that a petitioner be 'beneficially interested' has been generally interpreted to mean that one may obtain the writ only if the person has

some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large." (*Carsten* v. *Psychology Examining Com.* (1980) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276].)

 We need not decide if the Tobe plaintiffs have such a beneficial interest even though two have never been cited under the ordinance and one is not a homeless person, because as taxpayers they have standing under Code of Civil Procedure section 526a to restrain illegal expenditure or waste of city funds on *future* enforcement of an unconstitutional ordinance or an impermissible means of enforcement of a facially valid ordinance. (*White* v. *Davis, supra*, 13 Cal.3d 757, 764.) We must determine, therefore, whether the petitions at issue in this case stated and have perfected an as applied challenge to the Santa Ana ordinance.

1. *The Tobe petition.*

 The first of these actions (Tobe) has been prosecuted as a petition for writ of mandate by two homeless residents of Santa Ana, each of whom intends to remain in the city, and neither of whom can find affordable housing. The third plaintiff is a resident of Santa Ana. All are taxpayers. Respondents are Santa Ana, its mayor, its city manager, and its police chief.

Plaintiffs allege that they have been convicted in the past for violating the ordinance and expect to be arrested in the future for sleeping in public and conducting other ordinary and necessary daily activities in public areas. The allegations of the petition do not describe the circumstances of the past arrests and the petition does not allege or describe either the arrests or convictions of other persons that are claimed to have been unconstitutional applications of the ordinance.

The petition alleges that respondents' "pattern of arresting, detaining, harassing and incarcerating involuntarily homeless persons such as petitioners, for sleeping and engaging in other ordinary and essential activities of daily life" violates the rights of homeless persons. The only allegations that describe the pattern of enforcement that is claimed to be constitutionally impermissible are ones which state that respondents have caused plaintiffs and other homeless persons to risk arrest and/or detention without probable cause and other "abuses, indignities and punishment" for their homeless status and presence in Santa Ana. Although the petition alleges in conclusory language that a pattern of constitutionally impermissible enforcement of the ordinance existed, plaintiffs never identified the particular applications of the law to be enjoined. The only relief sought in the petition is a writ of

mandate enjoining *any* enforcement of the ordinance by respondents. That relief is the kind of relief sought in a facial attack.

Moreover, no alternative writ was issued and no evidentiary hearing was held. Plaintiffs did not create a factual record on which an injunction limited to improper applications of the ordinance could have been fashioned.

Thus, notwithstanding the contrary conclusion of the dissent, the allegations of the petition did not clearly state an as applied challenge to the ordinance and the petition did not seek relief from constitutionally impermissible applications or methods of enforcing the ordinance. The petition sought to enjoin *any* application of the ordinance to *any* person in *any* circumstance. And, contrary to the view of the dissent, which relies on "concessions" of the parties and the reporter's transcript, rather than the actual judgment of the court, the superior court did not rule on the petition as one encompassing an as applied challenge. The order of that court which directed issuance of a peremptory writ invalidating one sentence of the ordinance as vague, did not identify or dispose of any such challenge. Instead, the court found only that "enforcement of Santa Ana Ordinance NS-2160 . . . does not violate the rights of homeless persons to freedom of movement" and that "petitioners' challenges to the constitutionality of the remaining portions of Santa Ana Ordinance NS-2160 are without merit."

The petition sought to enjoin enforcement of the ordinance on the ground that it was invalid because it violated the rights of the homeless. The court ruled that enforcement did not violate those rights. The court made no findings related to a pattern of enforcement of the ordinance and the judgment makes no mention of the manner in which the ordinance has been applied.

Moreover, even assuming that plaintiffs attempted to allege and prosecute an as applied challenge, and that the superior court did entertain plaintiffs' argument that they had mounted an as applied challenge to the ordinance, the superior court did not err in failing to rule on an as applied challenge as plaintiffs did not perfect a basis for ruling on such a challenge.

The only documents in the record that describe the manner in which the ordinance has been applied are declarations submitted six months after the petition was filed in conjunction with the superior court's hearing on plaintiffs' motion for issuance of a peremptory writ. Some of the declarations were by persons other than plaintiffs who stated that they had been arrested or cited for violation of the ordinance. None of those declared that he or she had ever been convicted and had a sentence imposed for violation of the

ordinance. None stated facts to support a conclusion that citations were given solely for the purpose of harassment and were not prosecuted thereafter, and none stated facts to support either the claim that the ordinance had been enforced discriminatorily against the homeless or the claim that a pattern of constitutionally impermissible enforcement existed. The declarations, which were the only evidence offered in the case,[6] reflected only that persons who were homeless engaged in conduct that violated the ordinance and were arrested or cited for so doing.[7] The declarations described the conduct which led to citations only from the perspective of the person cited. They left unclear whether it may have appeared to the officer who issued the citation that the individual was using or storing camp paraphernalia, or living temporarily, on public property.

Moreover, assuming that persons whose violation of the ordinance is involuntary may offer a due-process-based necessity defense, the declarations did not demonstrate an impermissible pattern of enforcement against such persons.[8]

Two of the declarants were plaintiffs. One was not homeless. The other conceded, contrary to the allegations of the petition, that he had never been cited under the ordinance.

Only one of the remaining seven declarants explained why he had not been able to find lawful shelter on the night he was cited for violation of the ordinance. That declarant was unable to get on the bus to the armory shelter on the night he was cited. His declaration, like those of most of the other declarants, did not indicate that he had applied for public assistance that might have made it possible to find housing. Among the reasons given by the other declarants for "camping" on public property at the time they were cited were that the civic center area was "safer," that the declarant had been turned away from a shelter a few weeks earlier and had not returned, that the civic center was convenient to food and there was safety in numbers, that the declarant had missed the bus to the armory, that shelters were so noisy and overcrowded that the declarant could not sleep there, and that the declarant

---

[6]Santa Ana did not offer evidence to rebut the declarants' description of the circumstances in which they were cited for violating the ordinance, believing the declarations to be irrelevant to the issues raised by the petition.

[7]We do not understand plaintiffs to be arguing that a person who chooses voluntarily to camp on public property has a constitutionally protected right to do so, or that it would be improper to cite and convict such persons for violating the ordinance.

[8]Unlike the dissent, we cannot conclude that the city intends to enforce the ordinance against persons who have no alternative to "camping" or placing "camp paraphernalia" on public property. (Dis. opn., *post*, p. 1123, fn. 14.) A senior deputy district attorney expressed his opinion at oral argument before this court that a necessity defense might be available to "truly homeless" persons and said that prosecutorial discretion would be exercised.

did not like the armory because there was too much noise and he liked to be by himself.

While one of the declarants claimed to be schizophrenic, and stated that she had applied for and was awaiting Social Security assistance, she did not state whether she had sought public assistance from the county or that she had been turned away by a homeless shelter on the night she was cited.

Assuming that plaintiffs attempted to mount an as applied challenge to the ordinance on this basis, therefore, they simply did not demonstrate that the ordinance had been enforced in a constitutionally impermissible manner against homeless persons who had no alternative but to "camp" on public property in Santa Ana.

As discussed above, an as applied challenge assumes that the statute or ordinance violated is valid and asserts that the manner of enforcement against a particular individual or individuals or the circumstances in which the statute or ordinance is applied is unconstitutional. All of the declarants who had been cited under the ordinance described conduct in which they had engaged and that conduct appears to have violated the ordinance. None describes an impermissible means of enforcement of the ordinance or enforcement in circumstances that violated the constitutional rights the petition claimed had been violated. None demonstrated that the circumstances in which he or she was cited affected the declarant's right to travel. None states facts to support a conclusion that any punishment, let alone cruel and unusual punishment proscribed by the Eighth Amendment, had been imposed. Since no constitutionally impermissible pattern, or even single instance, of constitutionally impermissible enforcement was shown, no injunction against such enforcement could be issued and none was sought by plaintiffs.

Because the Tobe plaintiffs sought only to enjoin *any* enforcement of the ordinance and did not demonstrate a pattern of unconstitutional enforcement, the petition must be considered as one which presented only a facial challenge to the ordinance.

2. *The Zuckernick petition.*

The second action (Zuckernick) has been prosecuted as a petition for writ of mandate to compel the municipal court in which petitioners are charged with violation of the ordinance to sustain their demurrers to the complaints and to dismiss the charges. The petition was filed in the Court of Appeal after the municipal court overruled the demurrers.

The Zuckernick petition arises out of an order overruling a demurrer to a criminal complaint. A demurrer to a criminal complaint lies only to challenge the sufficiency of the pleading and raises only issues of law. (*People* v. *McConnell* (1890) 82 Cal. 620 [23 P. 40]; *Ratner* v. *Municipal Court for the Los Angeles Judicial District* (1967) 256 Cal.App.2d 925, 929 [64 Cal.Rptr. 500]; see also, 4 Witkin, Cal. Criminal Law (2d ed. 1989) § 2127, p. 2498.) Penal Code section 1004 expressly limits demurrers to defects appearing on the face of the accusatory pleading:

"The defendant may demur to the accusatory pleading at any time prior to the entry of a plea, *when it appears upon the face thereof* either:

"1. If an indictment, that the grand jury by which it was found had no legal authority to inquire into the offense charged, or, if an information or complaint that the court has no jurisdiction of the offense charged therein;

"2. That it does not substantially conform to the provisions of Sections 950 and 952, and also Section 951 in case of an indictment or information;

"3. That more than one offense is charged, except as provided in Section 954;

"4. That the facts stated do not constitute a public offense;

"5. That it contains matter which, if true, would constitute a legal justification or excuse of the offense charged, or other legal bar to the prosecution." (Italics added.)

 The Zuckernick petitioners demurred to the complaints on the ground that they did not conform to the provisions of Penal Code sections 950 and 952;[9] that the facts alleged did not constitute a public offense; that the complaints contained matters constituting a legal justification or excuse

---

[9]Penal Code section 950:
"The accusatory pleading must contain:
"1. The title of the action, specifying the name of the court to which the same is presented, and the names of the parties;
"2. A statement of the public offense or offenses charged therein."
Penal Code section 952: "In charging an offense, each count shall contain, and shall be sufficient if it contains in substance, a statement that the accused has committed some public offense therein specified. Such statement may be made in ordinary and concise language without any technical averments or any allegations of matter not essential to be proved. It may be in the words of the enactment describing the offense or declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is accused. In charging theft it shall be sufficient to allege that the defendant unlawfully took the labor or property of another."

or other legal bar to the prosecution; and that the offense charged was unconstitutionally vague and overbroad, and violated the right to travel. The demurrer recited in addition that it was "based upon the fact that the ordinances and penal statutes allegedly violated are unconstitutionally overbroad and vague in violation of the Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution; unconstitutionally infringe on the defendant's right to travel and freedom of travel [*sic*]." Elsewhere the demurrer also asserted that the ordinance violates the Eighth Amendment prohibition against cruel and unusual punishment and the state constitutional prohibition against cruel or unusual punishment. (Cal. Const., art. I, § 17.)[10]

None of the complaints in the Zuckernick proceedings included any allegations identifying the defendant as an involuntarily homeless person whose violation of the ordinance was involuntary and/or occurred at a time when shelter beds were unavailable.[11] Although the petition for writ of mandate included allegations regarding Santa Ana's past efforts to rid the city of its homeless population, those allegations, even if true, were irrelevant to the legal sufficiency of the complaints. (*Harman* v. *City and County of San Francisco* (1972) 7 Cal.3d 150, 166 [101 Cal.Rptr. 880, 496 P.2d 1248]; *People* v. *Williams* (1979) 97 Cal.App.3d 382, 391 [158 Cal.Rptr. 778].)

The Zuckernick demurrers and petition for writ of mandate necessarily constituted only a facial attack on the ordinance since the defendants could not, on a demurrer to the accusatory pleading, offer evidence that as applied

---

[10]We assume, and respondents do not contend otherwise, that if a statute under which a defendant is charged with a crime is invalid, the complaint is subject to demurrer under subdivisions 1, 4 and 5 of Penal Code section 1004 on the ground that the court lacks jurisdiction because the statute is invalid, the facts stated do not constitute a public offense, and the complaint contains matter which constitutes a legal bar to the prosecution. (See *Dillon* v. *Municipal Court, supra*, 4 Cal.3d 860, 865; *In re Cregler* (1961) 56 Cal.2d 308, 310 [14 Cal.Rptr. 289, 363 P.2d 305]; *Mandel* v. *Municipal Court* (1969) 276 Cal.App.2d 649, 652 [81 Cal.Rptr. 173].)

We do not agree with the Court of Appeal in *People* v. *Jackson* (1985) 171 Cal.App.3d 609, 615 [217 Cal.Rptr. 540], that grounds other than those specified in Penal Code section 1004 may be urged in support of a "common law demurrer" raising "constitutional and other attacks on the sufficiency of an accusatory pleading." Penal Code section 1002 specifies: "The only pleading on the part of the defendant is either a demurrer or a plea." Penal Code section 1004 specifies the grounds on which a demurrer may be made, and we have recognized that if a constitutional challenge is based on matters not appearing on the face of the accusatory pleading a demurrer will not lie. (*In re Berry* (1968) 68 Cal.2d 137, 146 [65 Cal.Rptr. 273, 436 P.2d 273].)

[11]The allegations charging violation of the ordinance recited only that: "On or about [date] said defendant, in violation of Section 10-402 of the Santa Ana Municipal Code, a MISDEMEANOR, did willfully and unlawfully, camp, use camp facilities, or camp paraphernalia in a public street or a public parking lot or other public area."

to their individual circumstances the ordinance was invalid. (See *Dillon* v. *Municipal Court, supra,* 4 Cal.3d 860, 865.) Those allegations are also irrelevant in determining the facial validity of the ordinance insofar as petitioners alleged that it violated their right to travel and constituted cruel and unusual punishment for status, since they do not establish that there were no circumstances in which the ordinance could be constitutionally applied.

Therefore, while we are not insensitive to the importance of the larger issues petitioners and amici curiae[12] seek to raise in these actions, or to the disturbing nature of the evidence which persuaded the Court of Appeal to base its decision on what it believed to be the impact of the ordinance on homeless persons, the only question properly before the municipal and superior courts and the Court of Appeal for decision was the facial validity of the ordinance.

■ We emphasize that the procedural posture of a case is not simply a "technicality." The procedural posture of a case is crucial to determining the proper scope of appellate review. (See, e.g., *Sebago, Inc.* v. *City of Alameda* (1989) 211 Cal.App.3d 1372, 1379 [259 Cal.Rptr. 918].) The procedural posture of a case also determines the ability of the parties to exercise their right to present relevant evidence and to the creation of a full record adequate to enable the reviewing court to make a reasoned decision on the questions before it. When an appellate court fails to limit the scope of review to issues properly presented in the trial court, it denies litigants their right to have appellate questions decided on the basis of a full record which exposes all of the relevant facts and circumstances.

■ The importance of these considerations is most clearly demonstrated in the Zuckernick matter. There the People had no opportunity to present evidence regarding the circumstances in which the petitioners had been arrested, as the only issue before the municipal court in ruling on the demurrer was the sufficiency of the complaints. That court properly ruled that the complaints were sufficient. How then can a reviewing court find error in that ruling on the basis of evidence unrelated to the sufficiency of the complaint which the People had no opportunity to rebut in the municipal court?

---

[12]Many of those issues are the result of legislative policy decisions. The arguments of many amici curiae regarding the apparently intractable problem of homelessness and the impact of the Santa Ana ordinance on various groups of homeless persons (e.g., teenagers, families with children, and the mentally ill) should be addressed to the Legislature and the Orange County Board of Supervisors, not the judiciary. Neither the criminal justice system nor the judiciary is equipped to resolve chronic social problems, but criminalizing conduct that is a product of those problems is not for that reason constitutionally impermissible. (See *Sundance* v. *Municipal Court, supra,* 42 Cal.3d 1101, and conc. opn. of Grodin, J., *id.* at p. 1139.)

In the Tobe matter, notwithstanding the declarations that were submitted by the plaintiffs, there was no evidence that the ordinance had been applied to any person in a constitutionally impermissible manner.

This court's consideration will, therefore, be limited to the facial validity of the ordinance.

B. *Motive of Legislators.*

The Court of Appeal also considered the evidence of Santa Ana's past attempts to remove homeless persons from the city significant evidence of the purpose for which the ordinance was adopted. It then considered that purpose in assessing the validity of the ordinance. ■■■ While the intent or purpose of the legislative body must be considered in construing an ambiguous statute or ordinance (Code Civ. Proc., § 1859; *People* v. *Pieters* (1991) 52 Cal.3d 894, 898-899 [276 Cal.Rptr. 918, 802 P.2d 420]), the motive of the legislative body is generally irrelevant to the validity of the statute or ordinance. (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 145 [130 Cal.Rptr. 465, 550 P.2d 1001]; *City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898, 913 [120 Cal.Rptr. 707, 534 P.2d 403]; *County of Los Angeles* v. *Superior Court* (1975) 13 Cal.3d 721, 726-727 [119 Cal.Rptr. 631, 532 P.2d 495]; *Sunny Slope Water Co.* v. *City of Pasadena* (1934) 1 Cal.2d 87, 99 [33 P.2d 672]; *In re Sumida* (1918) 177 Cal. 388, 390 [170 P. 823]; *Hadacheck* v. *Alexander* (1915) 169 Cal. 616, 617 [147 P. 259]; *Odd Fellows' Cem. Assn.* v. *City and County of San Francisco* (1903) 140 Cal. 226, 235-236 [73 P. 987]; *Dobbins* v. *City of Los Angeles* (1903) 139 Cal. 179, 184 [72 P. 970], revd. on other grounds (1904) 195 U.S. 223 [49 L.Ed. 169, 25 S.Ct. 18]; *People* v. *County of Glenn* (1893) 100 Cal. 419, 423 [35 P. 302].)[13]

The Court of Appeal relied in part on *Pottinger* v. *City of Miami* (S.D. Fla. 1992) 810 F.Supp. 1551, 1581, for its assumption that consideration of the motives of the Santa Ana City Council may be considered in assessing the validity of the ordinance. That is not the rule in this state, but even were it so, *Pottinger* was not a challenge to the facial validity of the Miami

---

[13]While the Court of Appeal considered Santa Ana's past actions and the documents suggesting that the city had mounted a concerted effort to remove homeless persons, it did not acknowledge that, as part of the settlement of a lawsuit seeking to enjoin further unlawful attempts to remove homeless persons, Santa Ana had agreed to take no further action to drive the homeless from the city. The Court of Appeal nonetheless assumed that the adoption of a facially neutral ordinance prohibiting camping and storing personal possessions on public property was a renewed effort to do so and a violation of the settlement agreement. Had it been a violation of the settlement agreement, however, the Tobe plaintiffs' appropriate recourse would have been through an action to enforce the settlement.

ordinance in question there. Moreover, the district court's conclusion that the ordinance was invalid as applied was not based on the motives of the legislators in enacting the ordinance. The court considered internal memoranda and evidence of arrest records as evidence of the purpose underlying *enforcement* of the ordinance against homeless persons.

Absent a basis for believing that the ordinance would not have been adopted if the public areas of Santa Ana had been appropriated for living accommodation by any group other than the homeless, or that it was the intent of that body that the ordinance be enforced only against homeless persons (see, e.g., *Parr* v. *Municipal Court* (1971) 3 Cal.3d 861 [92 Cal.Rptr. 153, 479 P.2d 353]), the ordinance is not subject to attack on the basis that the city council may have hoped that its impact would be to discourage homeless persons from moving to Santa Ana.

We cannot assume, as does the dissent, that the sole purpose of the Santa Ana ordinance was to force the homeless out of the city. The city had agreed to discontinue such attempts when it settled the prior litigation. The record confirms that the city faced a problem common to many urban areas, the occupation of public parks and other public facilities by homeless persons. Were we to adopt the approach suggested by the dissent, any facially valid ordinance enacted by a city that had once acted in a legally impermissible manner to achieve a permissible objective could be found invalid on the basis that its past conduct established that the ordinance was not enacted for a permissible purpose. Absent evidence other than the enactment of a facially valid ordinance, we cannot make that assumption here.

The dissent relies on *Parr* v. *Municipal Court, supra,* 3 Cal.3d 861, as supporting invalidation of a facially valid ordinance on the ground that it is motivated by impermissible legislative intent. The Santa Ana ordinance and the circumstances of its adoption are distinguishable from the Carmel ordinance at issue in *Parr,* however. There, the city had not entered into a court-approved settlement in which it stipulated that it would not engage in discriminatory enforcement of the law against "undesirables," and, unlike the Santa Ana ordinance, the Carmel ordinance banned a customary use of the city park—sitting or lying on the lawn. A "Declaration of Urgency" which accompanied the Carmel ordinance stated that its purpose was to regulate the use of public property, parks, and beaches by transient visitors.

The Carmel ordinance was challenged as facially invalid on grounds that it discriminated against undesirable and unsanitary persons, referring to them as "hippies" and "transients." In *Parr* v. *Municipal Court, supra,* 3 Cal.3d 861, we rejected the People's argument that only the operative language of

the ordinance should be considered because the declaration of purpose suggested that the operative sections were intended to be limited in their application to the group it described. On that basis we concluded that the Carmel ordinance had a discriminatory purpose.

The ordinance, by contrast, bans use of public property in the city for purposes for which it was not designed. At the time it was adopted the city had agreed not to engage in discriminatory law enforcement. And no declaration of purpose comparable to that which accompanied the Carmel ordinance was made. The declared purpose of the ordinance did not suggest that it was to be enforced solely against the homeless. We cannot, for those reasons, join the assumption of the dissent that the purpose of the ordinance is simply to drive the homeless out of Santa Ana.[14]

### C. Facial Challenges on Vagueness Grounds.

The Court of Appeal granted relief to the Zuckernick petitioners without regard to either the limitations on a demurrer to a criminal complaint or vagueness challenges by criminal defendants.

"The rule is well established . . . that one will not be heard to attack a statute on grounds that are not shown to be applicable to himself and that a court will not consider every conceivable situation which might arise under the language of the statute and will not consider the question of constitutionality with reference to hypothetical situations." (*In re Cregler*, *supra*, 56 Cal.2d 308, 313.) If the statute clearly applies to a criminal defendant's conduct, the defendant may not challenge it on grounds of vagueness. (*Parker* v. *Levy* (1974) 417 U.S. 733, 756 [41 L.Ed.2d 439, 457-458, 94 S.Ct. 2547]; *People* v. *Green* (1991) 227 Cal.App.3d 692, 696 [278 Cal.Rptr. 140].) However, in some cases, a defendant may make a facial challenge to the statute, if he argues that the statute improperly prohibits a " 'substantial amount of constitutionally protected conduct,' " whether or not its application to his own conduct may be constitutional. (*Kolender* v. *Lawson* (1983) 461 U.S. 352, 358-359, fn. 8 [75 L.Ed.2d 903, 909-910, 103 S.Ct. 1855].)[15]

The Zuckernick petitioners argued in support of their demurrers that the ordinance failed to give fair and adequate notice of prohibited conduct, had

---

[14]We also decline to join the conclusion of the dissent that enactment of an ordinance like that adopted by Santa Ana, whose purpose is to preserve public property for its intended use, is constitutionally impermissible because it may lead to the adoption of similar ordinances in other cities with the result that the homeless are everywhere excluded from living on public property.

[15]Because we conclude that the ordinance is not overbroad, we need not decide whether the overbreadth doctrine is applicable outside the area of freedoms protected by the First Amendment. The Supreme Court has stated that overbreadth challenges will be entertained

vague enforcement standards which encourage arbitrary and discriminatory arrests and convictions, and reached constitutionally protected conduct. The vagueness aspect of their challenge to the ordinance is governed by the rule stated in *In re Cregler, supra,* 56 Cal.2d 308, 313. The last ground, an overbreadth, not a vagueness, argument, is governed by *Kolender* v. *Lawson, supra,* 461 U.S. 352, 358-359, fn. 8 [75 L.Ed.2d 903, 909-910].)

The Zuckernick petitioners' vagueness challenge was addressed to the terms "camp," "camp facilities," and "camp paraphernalia," as defined in the ordinance, and the term "temporary shelter," which is not defined. The definitions in the ordinance include terms which those petitioners do not claim are vague and which may apply to petitioner's conduct. Thus the People may seek to establish violation of the ordinance on the basis that one or more of the petitioners pitched or used a tent on a public street or parking lot. Because the Zuckernick challenge to the ordinance was brought by demurrer and the nature of their conduct has not been determined, those petitioners cannot show at this stage of the proceedings that the ordinance did not clearly apply to their conduct. To that extent, therefore, the vagueness challenge of the Zuckernick petitioners is premature.

The Tobe plaintiffs are not persons presently charged with violating the ordinance, however. Their actions do not seek to avoid prosecution for criminal acts. They are suing as taxpayers to restrain expenditure of public funds on the enforcement of an allegedly unconstitutional ordinance. (Code Civ. Proc., § 526a.) The restrictions applicable to vagueness challenges by criminal defendants do not apply to their action.

With these considerations in mind, we now turn to the constitutional bases for the decision of the Court of Appeal.

### III

### FACIAL VALIDITY OF THE SANTA ANA ORDINANCE

#### A. *Right to Travel.*

█ Although no provision of the federal Constitution expressly recognizes a right to travel among and between the states, that right is recognized

only if a First Amendment violation is alleged. "[O]utside the limited First Amendment context, a criminal statute may not be attacked as overbroad." (*Schall* v. *Martin* (1984) 467 U.S. 253, 268, fn. 18 [81 L.Ed.2d 207, 220, 104 S.Ct. 2403].)

Other decisions of the United States Supreme Court suggest that this limitation is not invariably observed. (See *Kolender* v. *Lawson, supra,* 461 U.S. 352, 358-359, fn. 8 [75 L.Ed.2d 903, 909-910.) We will assume arguendo that the overbreadth doctrine may be applied outside the First Amendment context.

as a fundamental aspect of the federal union of states. "For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States." (*Passenger Cases* (1849) 48 U.S. (7 How.) 283, 492 [12 L.Ed. 702, 791] (dis. opn. of Taney, C. J.).)

In the *Passenger Cases, supra,* 48 U.S. 283, the court struck down taxes imposed by the States of New York and Massachusetts on aliens who entered the state from other states and countries by ship. The basis for the decision, as found in the opinions of the individual justices, was that the tax invaded the power of Congress over foreign and interstate commerce. The opinion of Chief Justice Taney, in which he disagreed with the majority on the commerce clause issue, also addressed the tax as applied to citizens of the United States arriving from other states. That tax he believed to be impermissible. Some later decisions of the court trace recognition of the constitutional right of unburdened interstate travel to that opinion. (See, e.g., *Shapiro* v. *Thompson* (1969) 394 U.S. 618, 630 [22 L.Ed.2d 600, 612-613, 89 S.Ct. 1322].) And, relying on the dissenting opinion of the Chief Justice in the *Passenger Cases*, the court struck down a tax on egress from the State of Nevada in *Crandall* v. *Nevada* (1867) 73 U.S. (6 Wall.) 35 [18 L.Ed. 745], holding that the right of interstate travel was a right of national citizenship which was essential if a citizen were to be able to pass freely through another state to reach the national or a regional seat of the federal government.

Other cases find the source of the right in the privileges and immunities clause. In *Paul* v. *Virginia* (1868) 75 U.S. (8 Wall.) 168 [19 L.Ed. 357], the court rejected a challenge predicated on the privileges and immunities clause made by a corporation to a tax imposed by the State of Virginia on out-of-state insurance companies. In so doing, it recognized interstate travel as a right guaranteed to citizens. "It was undoubtedly the object of the clause in question to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned. It relieves them from the disabilities of alienage in other States; it inhibits discriminating legislation against them by other States; *it gives them the right of free ingress into other States, and egress from them*; it insures to them in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness; and it secures to them in other States the equal protection of their laws." (*Id.* at p. 180 [19 L.Ed at p. 360], italics added.)

In the *Slaughter-House Cases* (1872) 83 U.S. (16 Wall.) 36 [21 L.Ed. 394], the court equated the rights protected by the privileges and immunities

clause to those in the corresponding provision of the Articles of Confederation which provided that the inhabitants of each state were to have " 'the privileges and immunities of free citizens in the several States; and the people of each State shall have free ingress and regress to and from any other State . . . .' " (83 U.S. at p. 75 [21 L.Ed. at p. 408].)

The privileges and immunities clause was also the source of the right of interstate travel as an incident of national citizenship recognized by the court in *Twining* v. *New Jersey* (1908) 211 U.S. 78, 97 [53 L.Ed. 97, 105, 29 S.Ct. 14] and *United States* v. *Wheeler* (1920) 254 U.S. 281, 293 [65 L.Ed. 270, 273, 41 S.Ct. 133]. In *Williams* v. *Fears* (1900) 179 U.S. 270, 274 [45 L.Ed. 186, 188-189, 21 S.Ct. 128], the right was held to be one protected by the Fourteenth Amendment as well as other provisions of the Constitution. "Undoubtedly the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any State is a right secured by the Fourteenth Amendment and by other provisions of the Constitution." (*Ibid.*) Again, in *Kent* v. *Dulles* (1958) 357 U.S. 116, 127 [2 L.Ed.2d 1204, 1211, 78 S.Ct. 1113], freedom to travel was recognized as "an important aspect of the citizen's 'liberty.' " (See also *Edwards* v. *California* (1941) 314 U.S. 160, 177, 183 [86 L.Ed. 119, 127, 62 S.Ct. 164] (conc. opns. of Douglas, J. and Jackson, J.).)

The right to travel, or right of migration, now is seen as an aspect of personal liberty which, when united with the right to travel, requires "that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." (*Shapiro* v. *Thompson, supra,* 394 U.S. 618, 629 [22 L.Ed.2d 600, 612]; see also *United States* v. *Guest* (1966) 383 U.S. 745, 757-758 [16 L.Ed.2d 239, 248-250, 86 S.Ct. 1170].)

In a line of cases originating with *Shapiro* v. *Thompson, supra,* 394 U.S. 618, the court has considered the right to travel in the context of equal protection challenges to state laws creating durational residency requirements as a condition to the exercise of a fundamental right or receipt of a state benefit. In those cases the court has held that a law which *directly* burdens the fundamental right of migration or interstate travel is constitutionally impermissible. Therefore a state may not create classifications which, by imposing burdens or restrictions on newer residents which do not apply to all residents, deter or penalize migration of persons who exercise their right to travel to the state.

In *Shapiro,* where public assistance was denied residents who had lived in the state for less than one year, the court held that durational residence as a

condition of receiving public assistance constituted invidious discrimination between residents, and that if a law had no other purpose than chilling the exercise of a constitutional right such as that of migration of needy persons into the state the law was impermissible. (*Shapiro* v. *Thompson, supra*, 394 U.S. 618, 627, 631 [22 L.Ed.2d 600, 613].) Further, "any classification which serves to penalize the exercise of [the right of migration], unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional." (*Id.* at p. 634 [22 L.Ed.2d at p. 615].)

Next, durational residence requirements for voting were struck down by the court in *Dunn* v. *Blumstein* (1972) 405 U.S. 330 [31 L.Ed.2d 274, 92 S.Ct. 995]. Again the question arose as an equal protection issue. The court held that the state must have a compelling reason for the requirement because it denied residents the right to vote, a fundamental political right, and because the law "classif[ies] . . . residents on the basis of recent travel, penalizing those persons . . . who have gone from one jurisdiction to another during the qualifying period. Thus, the durational residence requirement directly impinges on the exercise of a second fundamental personal right, the right to travel." (*Id.* at p. 338 [31 L.Ed.2d at pp. 281-282].) The court emphasized the imposition of a "direct" burden on travel: "Obviously, durational residence laws single out the class of bona fide state and county residents who have recently exercised this constitutionally protected right, and penalize such travelers directly." (*Ibid.*) It also took care to point out, as it had in *Shapiro* v. *Thompson, supra*, 394 U.S. 618, 638, fn. 21 [22 L.Ed.2d 600, 617]), that a law which did not penalize residents on the basis of recent travel would not be vulnerable to a similar challenge. The court explained: "Where, for example, an interstate migrant loses his driver's license because the new State has a higher age requirement, a different constitutional question is presented. For in such a case, the new State's age requirement is not a *penalty* imposed solely because the newcomer is a new resident; instead, all residents, old and new, must be of a prescribed age to drive." (405 U.S. at p. 342, fn. 12 [31 L.Ed.2d at p. 284].)

The court's focus on whether the law directly burdened, by penalizing, interstate travel continued in *Memorial Hospital* v. *Maricopa County* (1974) 415 U.S. 250 [39 L.Ed.2d 306, 94 S.Ct. 1076], in which a durational residence requirement for indigent, nonemergency medical care at county expense was challenged. The court held that the restriction denied newcomers equal protection, impinged on the right to travel by denying basic necessities of life, and penalized interstate migration. (*Id.* at pp. 261-262 [39 L.Ed.2d at pp. 316-317]; see also *Benson* v. *Arizona State Bd. of Dental Examiners* (9th Cir. 1982) 673 F.2d 272, 277 [licensing requirement that did not disadvantage newcomers vis-à-vis previous residents did not penalize exercise of right to travel].)

In each of these cases the court had before it a law which denied residents a fundamental constitutional right (voting) or a governmental benefit (public assistance, medical care) on the basis of the duration of their residence. The law created two classes of residents. In *Zobel* v. *Williams* (1982) 457 U.S. 55 [72 L.Ed.2d 672, 102 S.Ct. 2309], where the right to share in oil revenues was based on the duration of residence in Alaska, the court noted that the right to travel analysis in those cases, which did not create an actual barrier to travel, was simply a type of equal protection analysis. "In addition to protecting persons against the erection of actual barriers to interstate movement, the right to travel, when applied to residency requirements, protects new residents of a state from being disadvantaged because of their recent migration or from otherwise being treated differently from longer term residents. In reality, right to travel analysis refers to little more than a particular application of equal protection analysis. Right to travel cases have examined, in equal protection terms, state distinctions between newcomers and longer term residents." (*Id.* at p. 60, fn. 6 [72 L.Ed.2d at pp. 677-678].)

■ The right of intrastate travel has been recognized as a basic human right protected by article I, sections 7 and 24 of the California Constitution. (*In re White* (1979) 97 Cal.App.3d 141 [158 Cal.Rptr. 562].) There the court concluded that a condition of probation which barred a defendant convicted of prostitution from designated areas in the City of Fresno should be modified to avoid an overly restrictive impact on the defendant's right to travel. The court held that "the right to intrastate travel (which includes intramunicipal travel) is a basic human right protected by the United States and California Constitutions as a whole. Such a right is implicit in the concept of a democratic society and is one of the attributes of personal liberty under common law. (See 1 Blackstone, Commentaries 134; U.S. Const., art. IV, § 2 and the 5th, 9th and 14th Amends.; Cal. Const., art. I, § 7, subd. (a) and art. I, § 24 . . . . .)" (*Id.* at p. 148.) In *White*, as in the early United States Supreme Court cases, the court addressed a direct burden on travel.

Neither the United States Supreme Court nor this court has ever held, however, that the incidental impact on travel of a law having a purpose other than restriction of the right to travel, and which does not discriminate among classes of persons by penalizing the exercise by some of the right to travel, is constitutionally impermissible.

By contrast, in a decision clearly relevant here, a zoning law which restricted occupancy to family units or nonfamily units of no more than two persons was upheld by the Supreme Court, notwithstanding any incidental impact on a person's preference to move to that area, because the law was

not aimed at transients and involved no fundamental right. (*Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1, 7 [39 L.Ed.2d 797, 803, 94 S.Ct. 1536].)

Courts of this state have taken a broader view of the right of intrastate travel, but have found violations only when a direct restriction of the right to travel occurred. (*Adams* v. *Superior Court* (1974) 12 Cal.3d 55, 61-62 [115 Cal.Rptr. 247, 524 P.2d 375].) In *In re White, supra,* the petitioner had been barred directly from traveling to specified areas. In *In re Marriage of Fingert* (1990) 221 Cal.App.3d 1575 [271 Cal.Rptr. 389], a parent had been ordered to move to another county as a condition of continued custody of a child. Indirect or incidental burdens on travel resulting from otherwise lawful governmental action have not been recognized as impermissible infringements of the right to travel and, when subjected to an equal protection analysis, strict scrutiny is not required. If there is any rational relationship between the purpose of the statute or ordinance and a legitimate government objective, the law must be upheld. (*Adams* v. *Superior Court, supra,* 12 Cal.3d 55, 61-62.)

This court has also rejected an argument that any legislation that burdens the right to travel must be subjected to strict scrutiny and sustained only if a compelling need is demonstrated. In *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038], an initiative ordinance which banned issuance of new building permits until support facilities were available was challenged as an impermissible burden on the right to travel. We rejected the argument because the impact of the ordinance was only an indirect burden on the right to travel. The ordinance did not penalize travel and resettlement, although an incidental impact was to make it more difficult to establish residence in the place of one's choosing. (*Id.* at pp. 602-603; see also *R.H. Macy & Co.* v. *Contra Costa County* (1990) 226 Cal.App.3d 352, 367-369 [276 Cal.Rptr. 530].)

We do not question the conclusion of the Court of Appeal that a local ordinance which forbids sleeping on public streets or in public parks and other public places may have the effect of deterring travel by persons who are unable to afford or obtain other accommodations in the location to which they travel. ■■■■ Assuming that there may be some state actions short of imposing a direct barrier to migration or denying benefits to a newly arrived resident which violate the right to travel, the ordinance does not do so. It is a nondiscriminatory ordinance which forbids use of the public streets, parks, and property by residents and nonresidents alike for purposes other than those for which the property was designed. It is not constitutionally invalid because it may have an incidental impact on the right of some persons to interstate or intrastate travel.

As we have pointed out above, to succeed in a facial challenge to the validity of a statute or ordinance the plaintiff must establish that " 'the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional provisions.' " (*Arcadia Unified School Dist.* v. *State Dept. of Education, supra,* 2 Cal.4th 251, 267, quoting *Pacific Legal Foundation* v. *Brown, supra,* 29 Cal.3d 168, 180-181.) All presumptions favor the validity of a statute. The court may not declare it invalid unless it is clearly so. (*Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 814-815 [258 Cal.Rptr. 161, 771 P.2d 1247].)

 Since the Santa Ana ordinance does not on its face reflect a discriminatory purpose, and is one which the city has the power to enact, its validity must be sustained unless it cannot be applied without trenching upon constitutionally protected rights. The provisions of the Santa Ana ordinance do not inevitably conflict with the right to travel. The ordinance is capable of constitutional application. The ordinance prohibits "any person" from camping and/or storing personal possessions on public streets and other public property. It has no impact, incidental or otherwise, on the right to travel except insofar as a person, homeless or not, might be discouraged from traveling to Santa Ana because camping on public property is banned. An ordinance that bans camping and storing personal possessions on public property does not directly impede the right to travel. (*People* v. *Scott* (1993) 20 Cal.App.4th Supp. 5, 13 [26 Cal.Rptr.2d 179].) Even assuming that the ordinance may constitute an incidental impediment to some individuals' ability to travel to Santa Ana, since it is manifest that the ordinance is capable of applications which do not offend the Constitution in the manner suggested by petitioners and the Court of Appeal, the ordinance must be upheld.

Our conclusion that the Santa Ana ordinance does not impermissibly infringe on the right of the homeless, or others, to travel, finds support in the decision of the United States District Court in *Joyce* v. *City and County of San Francisco* (N.D.Cal. 1994) 846 F.Supp. 843. The plaintiffs, on behalf of a class of homeless individuals, sought a preliminary injunction to prevent implementation of a program of enforcement (the Matrix Program) of state and municipal laws which were commonly violated by the homeless residents of the city. Among the laws to be enforced were those banning "camping" or "lodging" in public parks and obstructing sidewalks. It was claimed, inter alia, that the Matrix Program infringed on the right to travel. The court rejected that argument and refused to require the city to show a compelling state interest to justify any impact the program might have on the right of the class members to travel. It noted that the program was not facially discriminatory as it did not distinguish between persons who were

residents of the city and those who were not. In so doing, the court suggested that the opinion of the Court of Appeal in this case was among those which constituted extensions of the right to travel that appeared to be "unwarranted under the governing Supreme Court precedent." (*Id.* at p. 860.) We agree.

 The right to travel does not, as the Court of Appeal reasoned in this case, endow citizens with a "right to live or stay where one will." While an individual may travel where he will and remain in a chosen location, that constitutional guaranty does not confer immunity against local trespass laws and does not create a right to remain without regard to the ownership of the property on which he chooses to live or stay, be it public or privately owned property.

 Moreover, lest we be understood to imply that an as applied challenge to the ordinance might succeed on the right to travel ground alone, we caution that, with few exceptions,[16] the creation or recognition of a constitutional right does not impose on a state or governmental subdivision the obligation to provide its citizens with the means to enjoy that right. (*Harris* v. *McRae* (1980) 448 U.S. 297, 317-318 [65 L.Ed.2d 784, 804-806, 100 S.Ct. 2671]; *Maher* v. *Roe* (1977) 432 U.S. 464, 471-474 [53 L.Ed.2d 484, 492-495, 97 S.Ct. 2376].) Santa Ana has no constitutional obligation to make accommodations on or in public property available to the transient homeless to facilitate their exercise of the right to travel. (*Lindsey* v. *Normet* (1972) 405 U.S. 56, 74 [31 L.Ed.2d 36, 50-51, 92 S.Ct. 862].) Petitioners' reliance on *Clark* v. *Community for Creative Non-Violence* (1984) 468 U.S. 288 [82 L.Ed.2d 221, 104 S.Ct. 3065], for the proposition that Santa Ana is obliged to provide areas in which camping is permitted on public property is misplaced. The issue in *Clark* was whether the refusal of the National Park Service to permit demonstrators who wished to call attention to the plight of the homeless to sleep in Lafayette Park and on the Mall in the nation's capital violated the First Amendment rights of the demonstrators. The court held that it did not, as other areas were available for the purpose. *Clark* dealt with an affirmative right—that of free speech —which could be restricted in public fora only by reasonable, content-neutral time, place and manner restrictions. (*Id.* at p. 293 [82 L.Ed.2d at p. 293-294].) The court expressly recognized the authority of the National Park Service "to promulgate rules and regulations for the use of the parks in

---

[16]E.g., the right to counsel guaranteed by the Sixth Amendment to the United States Constitution.

accordance with the purposes for which they were established."[17] (468 U.S. at p. 289 [82 L.Ed.2d at p. 224].) Petitioners in this case make no claim that the right they seek, to camp on public property in Santa Ana, is expressive conduct protected by the First Amendment. There is no comparable constitutional mandate that sites on public property be made available for camping to facilitate a homeless person's right to travel, just as there is no right to use public property for camping or storing personal belongings.[18]

The Court of Appeal erred in holding that the Santa Ana ordinance impermissibly infringes on the right of the homeless to travel.

### B. *Punishment for Status.*

The Court of Appeal invalidated the ordinance for the additional reason that it imposed punishment for the "involuntary status of being homeless."[19] On that basis the court held the ordinance was invalid because such punishment violates the Eighth Amendment prohibition of cruel and unusual punishment, and the ban on cruel or unusual punishment of article I, section 17 of the California Constitution. We disagree with that construction of the ordinance and of the activity for which punishment is authorized. The ordinance permits punishment for proscribed conduct, not punishment for status.

The holding of the Court of Appeal is not limited to the face of the ordinance, and goes beyond even the evidence submitted by petitioners. Neither the language of the ordinance nor that evidence supports a conclusion that a person may be convicted and punished under the ordinance solely

---

[17]The ordinance mirrors the National Park Service rules and regulations governing camping in several respects. Those rules prohibit camping by using park lands as living accommodations and storing personal belongings on them. (36 C.F.R. §§ 2.22, 2.61 (1994).)

[18]Petitioners' argument that Santa Ana may not deny homeless persons the right to live on public property anywhere in the city unless it provides alternative accommodations also overlooks the Legislature's allocation of responsibility to assist destitute persons to counties. (Welf. & Inst. Code, §§ 17000-17001.5.) If the inability of petitioners and other homeless persons in Santa Ana to afford housing accounts for their need to "camp" on public property, their recourse lies not with the city, but with the county under those statutory provisions.

[19]In reaching that decision, the Court of Appeal did not distinguish between involuntarily being homeless, and involuntarily engaging in conduct that violated the ordinance. The court assumed that an involuntarily homeless person who involuntarily camps on public property may be convicted or punished under the ordinance. That question, which the Court of Appeal and the dissent address, and which might be raised in an as applied challenge to the ordinance, is not before us because plaintiffs offered no evidence that the ordinance was being applied in that manner. We express no opinion on the proper construction of the ordinance, in particular on whether the conduct it prohibits must be "willful," or on whether or in what circumstances a necessity defense is available.

on the basis that he or she has no fixed place of abode. No authority is cited for the proposition that an ordinance which prohibits camping on public property punishes the involuntary status of being homeless or, as the Court of Appeal also concluded, is punishment for poverty. *Robinson v. California* (1962) 370 U.S. 660 [8 L.Ed.2d 758, 82 S.Ct. 1417], on which the court relied, dealt with a statute which criminalized the status of being addicted to narcotics. The court made it clear, however, that punishing the conduct of using or possessing narcotics, even by an addict, is not impermissible punishment for status. (370 U.S. at pp. 664, 666 [8 L.Ed.2d at pp. 761-763].)

A plurality of the high court reaffirmed the *Robinson* holding in *Powell* v. *Texas* (1968) 392 U.S. 514 [20 L.Ed.2d 1254, 88 S.Ct. 2145], where it rejected a claim that punishment of an alcoholic for being drunk in public was constitutionally impermissible. "The entire thrust of *Robinson's* interpretation of the Cruel and Unusual Punishment Clause is that criminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some *actus reus*. It thus does not deal with the question of whether certain conduct cannot constitutionally be punished because it is, in some sense, 'involuntary' or 'occasioned by a compulsion.' " (*Id.* at p. 533 [20 L.Ed.2d at p. 1268].)

As the district court observed in *Joyce v. City and County of San Francisco, supra*, 846 F.Supp. 843, 857, the Supreme Court has not held that the Eighth Amendment prohibits punishment of acts derivative of a person's status. Indeed, the district court questioned whether "homelessness" is a status at all within the meaning of the high court's decisions. "As an analytical matter, more fundamentally, homelessness is not readily classified as a 'status.' Rather, as expressed for the plurality in *Powell* by Justice Marshall, there is a 'substantial definitional distinction between a "status" . . . and a "condition" . . . .' 392 U.S. at 533, 88 S.Ct. at 2155. While the concept of status might elude perfect definition, certain factors assist in its determination, such as the involuntariness of the acquisition of that quality (including the presence or not of that characteristic at birth), *see Robinson*, 370 U.S. at 665-69 & [fn.] 9, 82 S.Ct. at 1420-21 & [fn.] 9, and the degree to which an individual has control over that characteristic." (846 F.Supp. at p. 857.)

The declarations submitted by petitioners in this action demonstrate the analytical difficulty to which the *Joyce* court referred. Assuming arguendo the accuracy of the declarants' descriptions of the circumstances in which they were cited under the ordinance, it is far from clear that none had alternatives to either the condition of being homeless or the conduct that led to homelessness and to the citations.

The Court of Appeal erred, therefore, in concluding that the ordinance is invalid because it permits punishment for the status of being indigent or homeless.

### C. *Vagueness and Overbreadth.*

The Court of Appeal concluded that the ordinance was vague and overbroad. It based its vagueness conclusion on the nonexclusive list of examples of camping "paraphernalia" and "facilities" in the definitions of those terms. Those definitions were so unspecific, the court reasoned, that they invited arbitrary enforcement of the ordinance in the unfettered discretion of the police. The overbreadth conclusion was based on reasoning that the ordinance could be applied to constitutionally protected conduct. In that respect the court held that the verb "store" was overbroad as it could be applied to innocent conduct such as leaving beach towels unattended at public pools and wet umbrellas in library foyers.

### 1. *Vagueness.*

 The Tobe respondents and the People, real party in interest in the Zuckernick matter, argue that the Court of Appeal failed to apply the tests enunciated by the United States Supreme Court and this court in applying the vagueness doctrine. It has isolated particular terms rather than considering them in context. We agree.

 A penal statute must define the offense with sufficient precision that "ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." (*Kolender* v. *Lawson, supra,* 461 U.S. 352, 357 [75 L.Ed.2d 903, 909]; see also *Papachristou* v. *City of Jacksonville* (1972) 405 U.S. 156, 162 [31 L.Ed.2d 110, 115-116, 92 S.Ct. 839]; *United States* v. *Harriss* (1954) 347 U.S. 612, 617 [98 L.Ed. 989, 996, 74 S.Ct. 808]; *Thornhill* v. *Alabama* (1940) 310 U.S. 88, 97-98 [84 L.Ed. 1093, 1099-1100, 60 S.Ct. 736].) "The constitutional interest implicated in questions of statutory vagueness is that no person be deprived of 'life, liberty, or property without due process of law,' as assured by both the federal Constitution (U.S. Const., Amends. V, XIV) and the California Constitution (Cal. Const., art. I, § 7)." (*Williams* v. *Garcetti* (1993) 5 Cal.4th 561, 567 [20 Cal.Rptr.2d 341, 853 P.2d 507].)

To satisfy the constitutional command, a statute must meet two basic requirements: (1) The statute must be sufficiently definite to provide adequate notice of the conduct proscribed; and (2) the statute must provide sufficiently definite guidelines for the police in order to prevent arbitrary and

discriminatory enforcement. (*Williams* v. *Garcetti, supra,* 5 Cal.4th 561, 567; *Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 141 [253 Cal.Rptr. 1, 763 P.2d 852]; *People* v. *Superior Court (Caswell)* (1988) 46 Cal.3d 381, 389-390 [250 Cal.Rptr. 515, 758 P.2d 1046].) Only a reasonable degree of certainty is required, however. (46 Cal.3d at p. 391.) The analysis begins with "the strong presumption that legislative enactments 'must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citations.] A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions, but it cannot be held void for uncertainty if any reasonable and practical construction can be given to its language.' " (*Walker* v. *Superior Court, supra,* 47 Cal.3d at p. 143.)

■ The Court of Appeal erred in holding that the ordinance is unconstitutionally vague. The terms which the Court of Appeal considered vague are not so when the purpose clause of the ordinance is considered and the terms are read in that context as they should be. (*Williams* v. *Garcetti, supra,* 5 Cal.4th 561, 569; see also *Clark* v. *Community for Creative Non-Violence, supra,* 468 U.S. 288, 290-291 [82 L.Ed.2d 221, 224-226]; *United States* v. *Musser* (D.C. Cir. 1989) 873 F.2d 1513 [277 App.D.C. 256]; *United States* v. *Thomas* (D.C. Cir. 1988) 864 F.2d 188, 197-198 [274 App.D.C. 385]; *ACORN* v. *City of Tulsa, Okl.* (10th Cir. 1987) 835 F.2d 735, 744-745.) Contrary to the suggestion of the Court of Appeal, we see no possibility that any law enforcement agent would believe that a picnic in a public park constituted "camping" within the meaning of the ordinance or would believe that leaving a towel on a beach or an umbrella in a library constituted storage of property in violation of the ordinance.

The stated purpose of the ordinance is to make public streets and other areas readily accessible to the public and to prevent use of public property "for camping purposes or storage of personal property" which "interferes with the rights of others to use the areas for which they were intended." No reasonable person would believe that a picnic in an area designated for picnics would constitute camping in violation of the ordinance. The ordinance defines camping as occupation of camp facilities, living temporarily in a camp facility or outdoors, or using camp paraphernalia. The Court of Appeal's strained interpretation of "living," reasoning that we all use public facilities for "living" since all of our activities are part of living, ignores the context of the ordinance which prohibits living not in the sense of existing, but dwelling or residing on public property. Picnicking is not living on public property. It does not involve occupation of "tents, huts, or temporary shelters" "pitched" on public property or residing on public property.

Nor is the term "store" vague. Accumulating or putting aside items, placing them for safekeeping, or leaving them in public parks, on public

streets, or in a public parking lot or other public area is prohibited by the ordinance. When read in light of the express purpose of the ordinance — to avoid interfering with use of those areas for the purposes for which they are intended — it is clear that leaving a towel on a beach, an umbrella in the public library, or a student backpack in a school, or using picnic supplies in a park in which picnics are permitted is not a violation of the ordinance.

Unlike the Court of Appeal, we do not believe that *People* v. *Mannon* (1989) 217 Cal.App.3d Supp. 1 [265 Cal.Rptr. 616], and *People* v. *Davenport* (1985) 176 Cal.App.3d Supp. 10 [222 Cal.Rptr. 736], which upheld application of similar ordinances, were wrongly decided.

In *Mannon* the appellate department rejected a claim that the defendants were not "camping" within the definition of a Santa Barbara city ordinance. The court reasoned: "There is nothing ambiguous about the meaning of the word 'camp.' The definition is 'to pitch or occupy a camp . . . to live temporarily in a camp or outdoors.' (Webster's Third New Intern. Dict. (1965) p. 322.) The illustrations of the word 'camp' utilized in the municipal code do not vary the traditional meaning of that word, they merely supplement it. The illustrations are consistent with the ordinary meaning of the word, i.e., living temporarily in the outdoors. . . . [A] reasonable person would understand 'camp' to mean to temporarily live or occupy an area in the outdoors, and would not be deceived or mislead by the undertaking of further explanation in the municipal code." (217 Cal.App.3d at pp. Supp. 4-5.)

The ordinance is not vague. It gives adequate notice of the conduct it prohibits. It does not invite arbitrary or capricious enforcement. The superior court properly rejected that basis of the Tobe plaintiffs' challenge to the ordinance. The Court of Appeal erred in reversing that judgment on that ground.

### 2. *Overbreadth.*

The Court of Appeal reasoned that the ordinance was broader than necessary since it banned camping on all public property. There is no such limitation on the exercise of the police power, however, unless an ordinance is vulnerable on equal protection grounds or directly impinges on a fundamental constitutional right.

If the overbreadth argument is a claim that the ordinance exceeds the police power of that city, it must also fail. There is no fundamental right to camp on public property; persons who do so are not a suspect classification;

and neither of the petitions claims that the ordinance is invidiously discriminatory on its face. The Legislature has expressly recognized the power of a city "to regulate conduct upon a street, sidewalk, or other public place or on or in a place open to the public" (Pen. Code, § 647c) and has specifically authorized local ordinances governing the use of municipal parks. (Pub. Resources Code, § 5193.) Adoption of the ordinance was clearly within the police power of the city, which may "make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7; *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 676 [209 Cal.Rptr. 682, 693 P.2d 261]; *Birkenfeld* v. *City of Berkeley*, *supra*, 17 Cal.3d 129, 159-160.) As the more than 90 cities and the California State Association of Counties that have filed an amicus curiae brief in this court have observed, a city not only has the power to keep its streets and other public property open and available for the purpose to which they are dedicated, it has a duty to do so. (*San Francisco Street Artists Guild* v. *Scott* (1974) 37 Cal.App.3d 667, 674 [112 Cal.Rptr. 502].)

 The Court of Appeal also failed to recognize that a facial challenge to a law on grounds that it is overbroad and vague is an assertion that the law is invalid in all respects and cannot have *any* valid application (*Hoffman Estates* v. *Flipside, Hoffman Estates* (1982) 455 U.S. 489, 494, fn. 5 [71 L.Ed.2d 362, 369, 102 S.Ct. 1186]), or a claim that the law sweeps in a substantial amount of constitutionally protected conduct. The concepts of vagueness and overbreadth are related, in the sense that if a law threatens the exercise of a constitutionally protected right a more stringent vagueness test applies. (*Id.* at p. 499 [71 L.Ed.2d at p. 372]; *Kolender* v. *Lawson*, *supra*, 461 U.S. 352, 358-359, fn. 8 [75 L.Ed.2d 903, 909-910].)

 Neither the Tobe plaintiffs nor the Zuckernick petitioners have identified a constitutionally protected right that is impermissibly restricted by application or threatened application of the ordinance. There is no impermissible restriction on the right to travel. There is no right to use of public property for living accommodations or for storage of personal possessions except insofar as the government permits such use by ordinance or regulation. Therefore, the ordinance is not overbroad, and is not facially invalid in that respect. It is capable of constitutional application.

Since the ordinance is not unconstitutionally overbroad, and the facial vagueness challenge must fail, the Court of Appeal erred in ordering dismissal of the complaints in the Zuckernick prosecution and enjoining enforcement of the ordinance.

## IV

### DISPOSITION

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Kennard, J., Arabian, J., and George, J., concurred.

**KENNARD, J.,** Concurring.—I join in the majority opinion. I write separately to clarify a point.

The concurring opinion of Justice Werdegar states that the majority "evidently reject[s] on its merits, the claim that a homeless person may not constitutionally be punished for publicly engaging in harmless activities necessary to life, such as sleeping." (Conc. opn. of Werdegar, J., *post*, at p. 1111.) Because that issue is not properly before us in this facial challenge to the ordinance, the majority does not address it, and it expressly says so: "[T]he Court of Appeal did not distinguish between involuntarily being homeless, and involuntarily engaging in conduct that violated the ordinance. The court assumed that an involuntarily homeless person who involuntarily camps on public property may be convicted or punished under the ordinance. That question, which the Court of Appeal and the dissent address, and which might be raised in an 'as applied' challenge to the ordinance, is not before us because plaintiffs offered no evidence that the ordinance was being applied in that manner. We express no opinion on the proper construction of the ordinance, in particular on whether the conduct it prohibits must be 'willful,' or on whether or in what circumstances a necessity defense is available." (Maj. opn., *ante*, at p. 1104, fn. 19.)

Thus, the majority does *not* decide whether a person who by reason of necessity falls asleep in a public park may constitutionally be successfully prosecuted. Moreover, the majority does not address, much less reject on its merits, a claim that there are no constitutional limits on punishing conduct regardless of the circumstances. Nor does it determine whether or not homelessness is a "status" as that term is described in *Robinson* v. *California* (1962) 370 U.S. 660 [8 L.Ed.2d 758, 82 S.Ct. 1417], and in *Powell* v. *Texas* (1968) 392 U.S. 514 [20 L.Ed.2d 1254, 88 S.Ct. 2145]. What the majority does decide is the issue before it: that the challenged *camping* ordinance does not on its face constitute prohibited punishment based on status. (Maj. opn., *ante*, at pp. 1104-1106.)

**WERDEGAR, J.,** Concurring.—I concur in the result and much of the reasoning of the majority. Specifically, I agree the procedural history of both

cases (Tobe and Zuckernick) dictates they be treated as purely facial challenges to the ordinance, and that the ordinance survives such a challenge. I write separately because in the process of rejecting plaintiffs' attack on the ordinance as cruel or unusual punishment, the majority enters into the merits of an as applied attack, an issue not properly before us. I would leave the question to another day, when we are presented with a case that requires its resolution.

To succeed, a *facial* attack on the anticamping ordinance as cruel and unusual punishment (U.S. Const., 8th Amend.) or as cruel or unusual punishment (Cal. Const., art. I, § 17) would require showing punishment under the ordinance, in *all its possible applications*, is cruel, unusual or both. Plaintiffs have not seriously advanced that proposition, and it could be rejected in few words. Clearly, *some* acts of camping in public places— pitching a tent in the middle of a street, for example—may constitutionally be punished.

The majority unnecessarily goes far beyond that reasoning, however, to consider, and evidently reject on its merits, the claim a homeless person may not constitutionally be punished for publicly engaging in harmless activities necessary to life, such as sleeping. Apparently the majority would reject this claim for two reasons: first, because, in its view, *conduct* may always be constitutionally punished no matter how inseparable it is, causally or logically, from a person's status or condition (maj. opn., *ante*, at pp. 1104-1105); and second, because it questions whether homelessness is a "status" at all within the meaning of the United States Supreme Court's decision in *Robinson* v. *California* (1962) 370 U.S. 660 [8 L.Ed.2d 758, 82 S.Ct. 1417] (maj. opn., *ante*, at p. 1105.)

Not surprisingly, since it has disavowed the intent to consider the merits of an as applied challenge, the majority treats these issues cursorily. In so doing, it fails to consider the legal arguments actually made, or the authorities cited, by petitioners and their allied amici curiae. This portion of the majority opinion is pure dictum and should be read as such.

**MOSK, J.**—I dissent.

By addressing only the facial challenges to the Santa Ana ordinance now before us and looking only to its neutral language, the majority sidestep the pressing and difficult issues raised in this case. In the process, they erect new procedural barriers that will make future as applied challenges to the ordinance costly and protracted, while shielding the ordinance from meaningful review. Unlike the majority, I decline to ignore the purpose and effect of the ordinance, whether it is assessed on its face or as applied.

The City of Santa Ana (hereafter the City or Santa Ana) enacted the challenged ordinance as the latest offensive in its five-year campaign to banish the homeless. Under its broad provisions, a person who "camps" in any public area or "stores" any personal property in any public area is subject to citation and arrest for a criminal offense punishable by six months in jail. (Santa Ana Ord. No. NS-2160, adding art. VIII, § 10-400 et seq. to Santa Ana Mun. Code (hereafter the ordinance), §§ 10-402, 10-403.) It has been enforced against homeless persons whose sole "crime" was to cover themselves with a blanket and rest in a public area. Homeless persons with no alternative but to temporarily leave their personal belongings in public places are also subject to repeated citation and arrest for violation of the ordinance's prohibition against "storing" property.

The City has conceded that the purpose of the ordinance is to address the "problem" of the homeless living in its parks and other public areas. The ordinance has, moreover, been enforced in a manner that specifically targets the homeless.

For those reasons, I conclude that the ordinance is unconstitutional both on its face and as applied to the homeless residents of Santa Ana. Although a city may reasonably control the use of its parks and other public areas, it cannot constitutionally enact and enforce an ordinance so sweeping that it literally prevents indigent homeless citizens from residing within its boundaries if they are unable to afford housing and unable to find a space in the limited shelters made available to them. The City cannot solve its "homeless problem" simply by exiling large numbers of its homeless citizens to neighboring localities.

Although not unconstitutionally vague, the ordinance fails under our decision in *Parr* v. *Municipal Court* (1971) 3 Cal.3d 861 [92 Cal.Rptr. 153, 479 P.2d 353] (hereafter *Parr*), because it violates the guaranty of equal protection under both the United States Constitution (14th Amend.) and the California Constitution (art. I, § 7, subd. (a)). It also impermissibly impairs the fundamental right of the homeless, under both the United States and California Constitutions, to travel freely within the state.[1]

I. *Facial and As Applied Claims*

The majority conclude that this action raises only facial claims. I disagree.

[1]Because I believe the ordinance is invalid on these grounds, I find it unnecessary to reach the issue whether the ordinance also punishes the homeless on the basis of their status in violation of the Eighth Amendment or article I, section 17, of the California Constitution. (But see *Robinson* v. *California* (1962) 370 U.S. 660, 665-667 [8 L.Ed.2d 758, 762-763, 82 S.Ct. 1417]; *Powell* v. *Texas* (1968) 392 U.S. 514, 551 [20 L.Ed.2d 1254, 1278, 88 S.Ct. 2145] (conc. opn. of White, J.); *id.* at pp. 567, 570 [20 L.Ed.2d at pp. 1286-1287, 1288] (dis. opn. of Fortas, J.); *Pottinger* v. *City of Miami* (S.D.Fla. 1992) 810 F.Supp. 1551, 1561-1565

### a. *Pleadings and Proceedings Below*

The Tobe plaintiffs expressly pleaded both facial and as applied claims in their petition for writ of mandate.[2] They also submitted factual evidence to support both the as applied and facial claims, including expert declarations and declarations by individual plaintiffs and others.

In opposing the writ, the City expressly acknowledged and addressed the Tobe plaintiffs' as applied claims. Thus, it conceded in its memorandum in opposition to the petition that "the present case involves a constitutional attack on a municipal ordinance, *both as applied and as written*, which, inter alia, prohibits camping on public property." (Italics added.) The City also conceded that "petitioners contend that the ordinance, *as applied to them*, abridges their right to travel" and that "petitioners contend that the Ordinance, *as applied* to homeless persons, punishes the status and condition of homelessness." (Italics added.)

At the hearing on their petition in the trial court, plaintiffs again expressly argued that the ordinance violated the Eighth Amendment and abridged the right to travel both on its face *and as applied*.[3] The trial court repeatedly acknowledged that the claims included both facial and as applied challenges. Thus it stressed that the "thrust of this case" was the contention that the ordinance "is designed and enacted *and implemented* as an effort to address a perceived problem by the authorities of the City of Santa Ana that regards the people who have been classified generically as, quote, 'homeless,' end quote." (Italics added.) The court expressly observed that the claims based on the right to travel and on the Eighth Amendment involved the "*application* of the statute," and it expressly considered how the ordinance "*in*

[city's practice of arresting homeless persons for such activities as sleeping, standing, and congregating in public places violated the Eighth Amendment].)

[2]Thus the petition alleged that the City had a "custom, practice, and policy of harassing, arresting, and otherwise interfering with petitioners and other homeless individuals for engaging in ordinary and essential activities of daily life in the public areas where petitioners are forced to live." Plaintiffs specifically pleaded, inter alia, that respondents "abused their discretion in enacting and *selectively enforcing Ordinance NS-2160 against homeless persons* in violation of their right to equal protection in that the ordinance abridges the fundamental right of the homeless to travel and to freedom of movement." (Italics added.) The petition expressly challenged particular applications of the ordinance, including the practice of arresting homeless persons for sleeping and possessing property in public areas. In their prayer for relief plaintiffs requested issuance of a peremptory writ of mandate compelling the City to refrain from enforcing the ordinance, i.e., the equivalent of an injunction against *future application* of the ordinance.

[3]Thus counsel for plaintiffs argued: "If the court were to conclude that the Ordinance on its face does not abridge the right to travel then I would submit to the court by way of our declarations and exhibits . . . that in fact *as applied* this ordinance abridges the right to travel of petitioners and homeless residents of the City of Santa Ana." (Italics added.)

*application . . .* has a tendency to impact certain classes of people more than others." (Italics added.)

The trial court properly addressed the vagueness and overbreadth claims solely as facial challenges; they were brought as such. By contrast, however, in rejecting the right to travel and Eighth Amendment claims the court did not indicate that it was limiting itself to a facial analysis or that it was precluded from considering the factual evidence submitted by plaintiffs. Indeed, as the City has repeatedly conceded, the court expressly considered and rejected plaintiffs' as applied arguments, together with the portions of the evidence that plaintiffs brought to its attention in support of those arguments.[4]

The City did not submit evidence or attempt to dispute or rebut the evidence submitted by plaintiffs, much of it derived from the City's own records. At oral argument before this court the City conceded that it was not precluded in the trial court from presenting evidence or disputing the declarations submitted by plaintiffs; it had the opportunity to present and rebut evidence but chose not to do so. As the record clearly shows, the City's strategy was to argue that the ordinance, both facially and as applied, was a valid exercise of its police power. It therefore regarded the evidence submitted by plaintiffs as essentially irrelevant. I have no trouble concluding that the City's strategy in this regard resulted in a waiver.

In its order directing issuance of a peremptory writ of mandate, the trial court ruled that "*enforcement* of Santa Ana Ordinance NS-2160 . . . does not violate the rights of *homeless persons* to freedom of movement. . . . The Court further finds that petitioners' challenges to the constitutionality of the remaining portions of Santa Ana Ordinance NS-2160 are without merit. The Court finds that with the exception of the second clause of Santa Ana

---

[4]Again, during oral argument before this court the City was pressed on the question whether plaintiffs raised as applied claims; it candidly admitted that plaintiffs challenged the ordinance both facially and as applied and that the Court of Appeal properly addressed the as applied claims. In supplemental briefing, the City once more conceded that plaintiffs raised both facial and as applied claims in the writ petition, that both parties addressed facial and as applied claims in their memoranda, and that they "argued *both aspects* of the right to travel/equal protection issue" at the hearing in the trial court. (Italics added.) As the City also conceded: "It is clear from a review of the reporter's transcript of the April 8, 1993 hearing that Judge Smith upheld the constitutionality of the ordinance, *both as written and as applied.* In rejecting appellants' 'as applied' attack, Judge Smith rejected appellants' supporting evidence." (Italics added.) These frank concessions by the City, which it documented with specific citations to the record, squarely refute the majority's conclusions that the allegations of the petition did not clearly state an as applied challenge and that the trial court did not rule on the petition as one encompassing an as applied challenge. (See maj. opn., *ante*, p. 1087.)

Municipal Code § 10-401(a), Santa Ana Ordinance NS-2160 is constitutionally valid." (Italics added.)

Nothing quoted in the order demonstrates that the trial court intended to, or did, address only the facial claims.[5] On the contrary, the order appears on its face to reject both facial *and* as applied claims: the court expressly and specifically refers to "enforcement" of the ordinance and to its constitutionality vis-à-vis the "rights of homeless persons."

The majority nonetheless conclude—despite the order, the transcript of the hearing, and the concessions of the parties—that no as applied challenge to the ordinance was "perfected." But they point to no deficiency in the pleadings. Instead, they merely note that "plaintiffs never identified the particular applications of the law to be enjoined," and the "only relief sought in the petition is a writ of mandate enjoining *any* enforcement of the ordinance by respondents." (Maj. opn., *ante*, pp. 1086-1087.)[6] The City made no objection on that ground, nor is there any indication in the record that the trial court declined to address the as applied claims on that basis. Certainly, had the trial court found merit in the as applied claims, it could readily have fashioned appropriate relief.[7]

---

[5] The majority purport to rely only on the "actual judgment of the court" and not on the concessions of parties and the reporter's transcript of the hearing on the writ. (Maj. opn., *ante*, p. 1087.) The judgment, however, does not refer to the grounds of the ruling. It provides in its entirety: "IT IS HEREBY ORDERED, ADJUDGED AND DECREED that: [¶] 1. Judgment is entered for petitioners granting the Peremptory Writ of Mandate. [¶] 2. The Court reserves jurisdiction over the issues of attorney's fees and costs. Any motion for attorney's fees and costs shall be filed in this Department."

[6] Although the majority observe that "the petition alleges in conclusory language that a pattern of unconstitutionally impermissible enforcement of the ordinance existed" (maj. opn., *ante*, p. 1086), there can be no doubt that under California's liberal pleading rules the petition was adequately pleaded: it gave notice of the claims and clearly alleged a pattern of constitutionally impermissible enforcement. The undisputed declarations in support of the petition show with specificity that the ordinance was repeatedly enforced against persons who were homeless. The prayer seeks relief as follows: "That a peremptory writ of mandate issue pursuant to Code of Civil Procedure Section 1085 compelling respondents to refrain from enforcement of Santa Ana Municipal Code Section NS02160 . . . [S]uch other and further relief as the Court may deem just and proper." The majority fail to identify any requirement of the Code of Civil Procedure or local rules that plaintiffs further delineate the relief sought on their as applied claims. Indeed, it is a rule of long standing that when an answer is filed a court may grant any relief consistent with the issues raised. (See, e.g., *Wright* v. *Rogers* (1959) 172 Cal.App.2d 349, 367-368 [342 P.2d 447].)

[7] For example, the court could have required that the City enforce the provisions of the ordinance prohibiting sleeping or storing personal property only against those persons who are *not* homeless. An ordinance that prevented only those *with* homes from "camping" in public areas might be constitutional; it would, of course, be of limited practical utility.

b. *Justiciability and Standing*

Plaintiffs include persons who have been cited under the ordinance and who, because they are homeless, are likely to be cited again. They thus have a direct personal stake in the outcome of this action.[8]

In addition, plaintiffs address their as applied claims broadly to the unlawful implementation of the ordinance against *all* homeless persons. Plaintiffs thus have sufficient interest as citizens of Santa Ana, under our "public right/public duty" doctrine, to bring claims on behalf of other homeless persons who have, as a group, been targeted by the ordinance. (See *Green* v. *Obledo* (1981) 29 Cal.3d 126, 144-145 [172 Cal.Rptr. 206, 624 P.2d 256]; *Common Cause* v. *Board of Supervisors* (1989) 49 Cal.3d 432, 439 [261 Cal.Rptr. 574, 777 P.2d 610].) The case "poses a question which is of broad public interest, is likely to recur, and should receive uniform resolution throughout the state." (*Ramirez* v. *Brown* (1973) 9 Cal.3d 199, 203 [107 Cal.Rptr. 137, 507 P.2d 1345].)

Our courts have repeatedly applied the "public right/public duty" exception to the general rule that ordinarily a writ of mandate will issue only to

---

[8]The majority question whether plaintiffs are "truly"—or even sufficiently—homeless, concluding that the declarations they submitted did not establish that the conduct for which they were cited was "involuntary." I am satisfied that the undisputed sworn statements of plaintiffs and others cited under the ordinance that they lack the present means to house themselves are sufficient to establish standing and to demonstrate a pattern of enforcement of the ordinance against homeless persons. We need not inquire into the "voluntariness" of all the acts or decisions that might have led to their current plight. As many of the briefs and expert submissions point out, the question whether the homeless, particularly the large proportion of homeless who are mentally ill or addicted to drugs or alcohol, are "voluntarily" living in the streets is complex. Even when services or welfare benefits are available, it may be beyond the resources of many homeless persons to avail themselves of such assistance.

In any event, in light of the shortage of services and beds for the homeless, including the mentally ill and unaccompanied children, the question of "voluntariness" is almost academic. The undisputed fact is that Santa Ana has only 332 beds for a population of approximately 3,000 homeless. The vast majority of homeless in Santa Ana do not have the alternative of sleeping in a bed, off the streets. (See also Vernez et al., Review of California's Program for the Homeless Mentally Disabled (1988) pp. 1, 13, 15 [RAND study prepared for California Department of Mental Health, reporting, inter alia, that about 30 percent of Orange County homeless suffer from severe mental disorders]; Stats. 1988, ch. 1517, § 1, p. 5382 [legislative finding that the extreme shortage of mental health services in California has led to redirection of long-term psychiatric patients "into a state of homelessness"]; Stats. 1985, ch. 1286, § 1.5, p. 4415 [legislative finding that "large numbers of mentally disordered adults are homeless"]; State of Cal., Department of Youth Authority, Policy Review and Update: Statewide Needs Assessment of Youth Shelters and Youth Centers (1993) pp. 1, II.2-3 [indicating that Orange County has only 31 beds for unaccompanied children, although there are an estimated 3,000 to 4,000 unaccompanied children in the county]; United States Conference of Mayors, A Status Report on Hunger and Homelessness in America's Cities: 1993—A 26 City Survey (Dec. 1993) p. 29 [children, including unaccompanied children or "runaways," account for an estimated 30 percent of the homeless population].)

persons who are "beneficially interested." (Code Civ. Proc., § 1086.) Thus in *Green* v. *Obledo, supra,* 29 Cal.3d 126, recipients of welfare benefits petitioned for writ of mandate challenging the compliance of a regulation with the Social Security Act. We held that " ' "where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the relator need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced . . . ." ' " (*Id.* at p. 144; accord, *Common Cause* v. *Board of Supervisors, supra,* 49 Cal.3d at p. 439.)[9]

Furthermore, plaintiffs show a sufficient beneficial interest as citizens who seek to restrain the illegal expenditure or waste of city funds to implement an ordinance in an unconstitutional manner. (See Code Civ. Proc., § 526a; *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 267-269 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206] [an action to restrain county or city officials from continuing to enforce provisions of an unconstitutional law presents a true case or controversy, regardless of whether the plaintiff and the defendant each have a special, personal interest in the outcome of the action]; *Van Atta* v. *Scott* (1980) 27 Cal.3d 424, 450, fn. 28 [166 Cal.Rptr. 149, 613 P.2d 210] [an action that "meets the criteria of section 526a satisfies case or controversy requirements"]; *Ames* v. *City of Hermosa Beach* (1971) 16 Cal.App.3d 146, 150 [93 Cal.Rptr. 786].) As we have emphasized, "it has never been the rule in this state that parties in [taxpayer suits] must have a personal interest in the litigation. . . . '[N]o showing of special damage to the particular taxpayer has been held necessary.' " (*Blair* v. *Pitchess, supra,* 5 Cal.3d at pp. 269-270.)

Because the City has used, and continues to use, taxpayer funds to cite and prosecute persons who store belongings or sleep in public places in violation of an ordinance challenged as unconstitutional, these citizen-plaintiffs have a sufficient interest to confer standing. Consequently, plaintiffs' as applied claims challenging the implementation of the ordinance against homeless persons present "a true case or controversy." (*Blair* v. *Pitchess, supra,* 5 Cal.3d at p. 269.)

The majority also conclude that an as applied claim challenging a criminal statute is justiciable only after "the circumstances of its application have

[9](See also *Parr, supra,* 3 Cal.3d 359 [plaintiff had standing to challenge an anti-"hippie" ordinance although she was herself manifestly not a "hippie" but a resident and merchant in the city]; *Timmons* v. *McMahon* (1991) 235 Cal.App.3d 512, 518 [286 Cal.Rptr. 620] [applying public interest exception in case involving eligibility rights for welfare benefits]; *Driving Sch. Assn. of Cal.* v. *San Mateo Union High Sch. Dist.* (1992) 11 Cal.App.4th 1513 [14 Cal.Rptr.2d 908] [applying public interest exception in case seeking to prevent school district from charging high school students tuition for a drivers' training class].)

been established by conviction or otherwise." (Maj. opn., *ante*, p. 1085.) But in analogous cases we have not required conviction as a prerequisite to standing. Thus in *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286 [124 Cal.Rptr. 204, 540 P.2d 44], we concluded that the defendants, members of a particular union, could obtain discovery to determine whether various penal statutes were being discriminatorily enforced against them in violation of equal protection. The defendants had been charged with, but not yet convicted of, violations of the statutes. (*Id.* at p. 291, fn. 2.) Indeed, we implicitly acknowledged that the defense of discriminatory enforcement did not reach the question of guilt or innocence: "Because the particular defendant, unlike similarly situated individuals, suffers prosecution simply as the subject of invidious discrimination, such defendant is very much the direct victim of the discriminatory enforcement practice. Under these circumstances, discriminatory prosecution becomes a compelling ground for dismissal of the criminal charge, since prosecution would not have been pursued except for the discriminatory design of the prosecuting authorities." (*Id.* at p. 298, fn. omitted.)[10]

The majority also plainly imply that an as applied challenge must necessarily be restricted to a case-by-case showing by each individual who is convicted under the ordinance that he or she was "truly homeless" and that the ordinance was improperly applied in each case. Such a requirement—which is tantamount to requiring an individual trial of a "necessity" defense for each person cited under the ordinance—is unwarranted. (See, e.g., *Ramirez* v. *Brown, supra,* 9 Cal.3d 199 [holding that challenged provisions were unconstitutional as applied to all ex-felons]; *Van Atta* v. *Scott, supra,* 27 Cal.3d at pp. 433, 452-453 [holding that San Francisco's manner of applying statutes for pretrial release of criminal defendants violated due process].) It would needlessly subject large numbers of homeless persons to the criminal justice system for wholly innocuous conduct and overwhelm

---

[10]Similarly, under the Eighth Amendment it is not essential to have a formal adjudication of guilt to challenge a provision that makes status a criminal offense. In *Joyce* v. *City and County of San Francisco* (N.D.Cal. 1994) 846 F.Supp. 843, 853, the district court expressly rejected the defendants' contention that a claim under the Eighth Amendment could be made only by a party convicted of a criminal offense. As *Joyce* emphasized, that proposition was refuted by the United States Supreme Court in *Ingraham* v. *Wright* (1977) 430 U.S. 651, 666-668 [51 L.Ed.2d 711, 726-728, 97 S.Ct. 1401], which expressly provided that in addition to proscribing certain types of punishments to those convicted of crimes, the amendment "imposes substantive limits on what can be made criminal." Like *Joyce*, this case alleges discrimination on the basis of the status of homelessness—i.e., it challenges the ordinance under the substantive provisions of the Eighth Amendment. Moreover, "fines . . . traditionally have been associated with the criminal process" and subjected to the limitations imposed by the Eighth Amendment. (*Ingraham* v. *Wright, supra,* 430 U.S. at p. 664 [51 L.Ed.2d at pp. 725-726].)

our already strained judicial resources, while effectively insulating the ordinance from meaningful review.[11]

Significantly, federal courts recently addressing similar challenges to "anti-camping" measures have consistently done so by examining ordinances as applied to the homeless in general, *not* on a case-by-case basis, and have not required conviction to establish standing. (See *Pottinger* v. *City of Miami*, *supra*, 810 F.Supp. at p. 1554 [challenging manner in which city "applies these laws to homeless individuals"]; *Joyce* v. *City and County of San Francisco*, *supra*, 846 F.Supp. at p. 846 [challenging ordinance "only insofar as it specifically penalizes certain 'life sustaining activities' engaged in by the homeless"]; *Johnson* v. *City of Dallas* (N.D.Tex. 1994) 860 F.Supp. 344, 346 [addressing constitutionality of city ordinances "enacted, enforced, or both, allegedly to remove homeless persons from public view"].)

In sum, there is ample authority to conclude that these plaintiffs have standing and state justiciable claims, both facial and as applied. Most of the plaintiffs have been cited and fined for violations of the ordinance, and most are taxpayers. Moreover, because Santa Ana has effectively criminalized sleeping and storing personal property in any public places, plaintiffs and other homeless persons in Santa Ana—who have no legal alternative but to sleep and store personal property in public short of leaving the city altogether—will necessarily be subject to future citation and/or arrest. The as applied claims are therefore properly before us.

## II. *Equal Protection*

In my view the ordinance violates equal protection under the rule of our decision in *Parr*, *supra*, 3 Cal.3d 861, because it intentionally discriminates against homeless persons who have no alternative but to sleep and store their property in public areas of the City.[12]

---

[11]We have recognized that mandamus review is appropriate where, as here, important issues would be effectively removed from judicial review if standing is not conferred. (See *Driving Sch. Assn. of Cal.* v. *San Mateo Union High Sch. Dist.*, *supra*, 11 Cal.App.4th at p. 1519 ["High school students who take this brief 24-hour class are unlikely to have the financial resources or the economic interest necessary to maintain the protracted litigation necessary to test the School District's authority to charge tuition for the class."].) In this case, similarly, the targets of the ordinance are unlikely to have the financial resources to test the City's authority on a case-by-case basis. Because the City may cite, arrest, and detain homeless residents repeatedly without "actually convicting" them in a full-blown judicial proceeding, even under the majority's construction it would be justiciable as an issue "evading review."

[12]The majority incorrectly assert that plaintiffs did not pursue an equal protection theory. The writ petition expressly pleaded equal protection claims, including violations of the right

### a. *Scope of Analysis*

As amici curiae for the City concede, "Neither we nor the Court can or should avoid that [*sic*] this case involves questions about the homeless, although the text of the Ordinance is neutral and does not single out the homeless in any manner." Although I believe we can construe the ordinance both facially and as applied, in either case we must look beyond the neutral face of the measure to its underlying purpose and its impact on particular groups.

There is ample precedent for doing so. In *Shapiro* v. *Thompson* (1969) 394 U.S. 618, 628 [22 L.Ed.2d 600, 611-612, 89 S.Ct. 1322], the Supreme Court examined the legislative history of the statutes there challenged and found "weighty evidence that exclusion from the jurisdiction of the poor who need or may need relief was the specific object of these provisions."[13]

In *Parr, supra,* 3 Cal.3d 861, we addressed a challenge to a facially neutral ordinance enacted by the City of Carmel-by-the-Sea that was similarly aimed at "an extraordinary influx of undesirable and unsanitary visitors to the City, sometimes known as 'hippies.' " (*Id.* at p. 863.) We determined that despite the neutral terms of the ordinance, we were required to look beyond its literal language to determine its purpose. We stressed that " '[a] state enactment cannot be construed for purposes of constitutional analysis without concern for its immediate objective [citations] and for its ultimate effect [citations].' " (*Id.* at p. 864.)

Among other precedents, we cited Justice Stephen J. Field's perceptive opinion in *Ho Ah Kow* v. *Nunan* (D.Cal. 1879) 12 F. Cas. 252 (No. 6,546), which invalidated a facially neutral San Francisco ordinance requiring every male entering the county jail to have his hair cut to a uniform length of one inch. Under the ordinance a Chinese man convicted of a misdemeanor violation was subjected to loss of his traditional queue.

Justice Field based his ruling on a conclusion that the purpose and effect of the ordinance—although not expressed on the face of the provision—was

---

to travel. *Parr, supra,* 3 Cal.3d 861, a case devoted to equal protection analysis, was extensively briefed by the parties and amici curiae. Moreover, as discussed below, the right to travel is properly analyzed under an equal protection test.

[13](See also *Arlington Heights* v. *Metropolitan Housing Corp.* (1977) 429 U.S. 252, 265-266 [50 L.Ed.2d 450, 464-465, 97 S.Ct. 555] [recognizing the relevance of discriminatory purpose in assessing the validity of a rezoning decision]; *Parr, supra,* 3 Cal.3d 861; *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 740-741, 747 [135 Cal.Rptr. 345, 557 P.2d 929] [invalidating California's facially neutral school financing scheme in its entirety on the basis of evidence showing it had a discriminatory effect]; see generally, *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836] ["both the legislative history of the statute and the wider historical circumstances of its enactment are legitimate and valuable aids in divining the statutory purpose"].)

to punish the then racially unpopular Chinese: "The class character of this legislation is none the less manifest because of the general terms in which it is expressed." (*Ho Ah Kow* v. *Nunan, supra,* 12 F. Cas. at p. 255.) He referred to statements of supervisors in debate on the passage of the ordinance for the purpose of ascertaining the "general object of the legislation proposed, and the mischiefs sought to be remedied." (*Ibid.*) He added, "When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men; and where an ordinance, though general in its terms, only operates upon a special race, sect or class, it being universally understood that it is to be enforced only against that race, sect or class, we may justly conclude that it was the intention of the body adopting it that it should only have such operation, and treat it accordingly." (*Ibid.*)

Guided by Justice Field, we declined in *Parr* to "blind ourselves to official pronouncements of hostile and discriminatory purpose solely because the ordinance employs facially neutral language." (3 Cal.3d at p. 865.) We examined the purpose expressed by the Carmel City Council in enacting the measure and concluded that "[t]he irrefragable implication is that the Carmel City Council sought, through Municipal Code section 697.02, to rid the city of the blight it perceived to be created by the presence of the hippies." (*Ibid.*)

In construing the Carmel ordinance we also examined its probable impact: "Those officials responsible for the enforcement of the law are put on notice that the public property in the city is in imminent danger because of the influx of a particular class against which the ordinance is unmistakably directed. The inevitable effect must be discriminatory enforcement consistent with the discriminatory purpose expressed by the council . . . ." (*Parr, supra,* 3 Cal.3d at p. 868.) On these grounds we held that the ordinance violated equal protection by stigmatizing a particular group. In the present case as well, we are obligated to look behind the neutral facade of the ordinance.

b. *Purpose and Effect of the Ordinance*

As in *Parr, supra,* 3 Cal.3d 861, although the ordinance is neutral on its face we need not go far afield to determine the purpose that the City sought to achieve. Over the past four years, Santa Ana has engaged in what the Court of Appeal aptly called a "crusade against the homeless."

In a memorandum titled "VAGRANTS," dated June 16, 1988, the City's executive director of the recreation and community services agency informed the City Park Superintendent: "A task force has been formed in an

effort to deal with the vagrants. The City Council has developed a policy that the vagrants are no longer welcome in the City of Santa Ana. . . . In essence, the mission of this program will be to move all vagrants and their paraphernalia out of Santa Ana by continually removing them from the places that they are frequenting in the City."

The City's vagrancy task force developed and implemented a plan that included discouraging food providers—such as the Orange County Rescue Mission and the Salvation Army—from feeding the homeless, turning on sprinklers in public parks, and confiscating and destroying the personal property of homeless residents. After a legal challenge to that plan the City agreed to a settlement in April 1990 that included posting maintenance hours, ceasing to conduct maintenance "sweeps" in public areas, and providing for storage and retrieval of confiscated property.

Only a few months later, however, in August 1990, the Santa Ana police mounted "Operation Civic Center," described in an internal memorandum as follows: "Eddie West Field [an open-air football stadium adjacent to the Civic Center] was used as the command post because it supplied a secured area where we could house multiple arrestees. In addition, it also allowed access to restroom facilities and water for the persons arrested. Four Police Service Officers were assigned to the command post to process all arrestees. This included photographing, fingerprinting, documentation and running record and warrant checks. Two officers were also assigned to the command post for care and custody of the arrestees. Five 2-man observer teams were assigned throughout the plaza area looking for criminal activity. Each of the five 2-man teams was completely concealed and was able to observe the violations from a safe and secure location. Five 2-man arrest teams were called into the plaza area by the observers and the arrest teams took the violators into custody. The violators were then transported to the command post at Eddie West Field where they were processed."

There were 28 arrests for littering, 2 for drinking in public, 7 for urinating in public, 18 for jaywalking, 2 for destroying vegetation, 2 for riding bicycles on a sidewalk, 1 for glue sniffing, 1 for removing trash from a bin, and 2 for an obscure violation of the City's fire code. Two persons who proved they had homes were released. The homeless arrestees were handcuffed, transported to an athletic field for booking, chained to benches for up to six hours, and identified with numbers written on their arms with markers. At the conclusion of the detention, the police loaded the homeless into vans, drove them to the edge of the Central Command Area of the Santa Ana Police Department, and dropped them off.

The homeless brought a further civil action against the City for injunctive relief, asserting they were victims of discriminatory law enforcement. The

trial court agreed, ruling that the homeless were a cognizable class who had been singled out for arrest for offenses that rarely, if ever, even drew citations in Santa Ana. The trial court concluded: "In short, this Court finds that the Santa Ana Police Department deliberately and intentionally implemented a program which targeted those persons living in the Civic Center, the homeless."

In October 1990 the City apparently settled the action. It agreed that "it shall be [] the policy of [the City of Santa Ana] to refrain from discriminating against individuals on the basis of their homelessness" and it shall not "take individual or concerted action to drive homeless individuals from Santa Ana." The stipulation was made an order of the court, but no judgment has been entered. The case is to be dismissed during this year.

The ordinance before us reflects the same purpose as Santa Ana's previous official policies: to drive "vagrants" out of Santa Ana. There can be no doubt that it was enacted to resolve what the City refers to in its brief as "the homeless problem." As that brief explains: "The City is directly impacted by the homeless problem because homeless persons attempt to live on property it owns or controls, thereby causing the myriad of public health and police related concerns which the City must combat in the face of constantly diminishing financial resources." The City again expressly conceded at oral argument that the purpose of the ordinance was to address the problem of homeless persons "camping" in public areas, including the parking lot across from city hall.[14]

Even if the City had not so candidly admitted its purpose, however, the inevitable effect of the ordinance is to target the homeless. Because there are beds in local shelters for only about one in ten homeless persons in Santa Ana, an ordinance outlawing "camping" in all public areas effectively accomplishes the purpose of driving out the homeless, despite its neutral wording. Although the City and amici curiae observe that the ordinance

[14]The majority expressly venture no opinion on whether and in what circumstances a necessity defense might be available. (Maj. opn., *ante,* p. 1104, fn. 19.) They nonetheless note that a deputy district attorney "expressed his opinion at oral argument" that a necessity defense "might" be available to "truly homeless" persons. (Maj. opn., *ante,* p. 1088 fn. 8.) Because of that "opinion" the majority refuse to conclude that the City intends to enforce the ordinance against persons who have no alternative to "camping" or storing "camp paraphernalia" on public property. Nothing in the ordinance provides an exception for homeless persons, however, and the district attorney's "opinion" does not purport to bind the City or even to express the *City's* intent in implementing the ordinance. Moreover, even if a necessity defense were available, it would not prevent the City from repeatedly citing and arresting homeless persons and subjecting them to an endless round of costly and complex judicial proceedings. Thus the effect of the ordinance would continue to be to drive the homeless from Santa Ana, as it is clearly intended to do.

would also apply to the mayor and the Girl Scouts, it is unlikely that any significant number of Santa Ana residents or visitors other than the homeless would choose to sleep, protected only by a blanket, in a public parking lot or to store personal property in the open.[15]

We concluded in *Parr, supra,* 3 Cal.3d at page 870, that "we cannot be oblivious to the transparent, indeed the avowed, purpose and the inevitable effect of the ordinance in question: to discriminate against an ill-defined social caste whose members are deemed pariahs by the city fathers. This court has been consistently vigilant to protect racial groups from the effects of official prejudice, and we can be no less concerned because the human beings currently in disfavor are identifiable by dress and attitudes rather than by color." That vigilance is even more important now. Today's pariahs are no longer the relatively carefree "hippies," many of whom chose that lifestyle, but persons who are homeless largely by necessity and who face far greater restrictions under this ordinance than merely keeping off the grass.[16]

A century ago Anatole France exposed the cruel hypocrisy of such "neutral" laws against the indigent: "The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread." (France, Le Lys Rouge (1894) ch. 7.) Even under a facial analysis we cannot blind ourselves to the evident intent of the Santa Ana ordinance. Recognizing that intent, I would hold that the ordinance

---

[15](See Waldron, *Homelessness & the Issue of Freedom* (1991) 39 UCLA L.Rev. 295, 313 [Anticamping ordinances "have and are known and even intended to have a specific effect on the homeless which is different from the effect they have on the rest of us. . . . [E]veryone is perfectly well aware of the point of passing these ordinances, and any attempt to defend them on the basis of their generality is quite disingenuous."].)

[16]The majority attempt to distinguish *Parr* on its facts, arguing that the Carmel ordinance "banned a customary use of the city park." (Maj. opn., *ante,* p. 1094.) But their discussion of *Parr* is merely dictum, because they decline to acknowledge or address the equal protection claims on the merits. It is also unpersuasive. The Carmel ordinance made it unlawful to "[c]limb any tree; or walk, stand or sit upon monuments, vases, fountains, railings, fences, planted areas, or upon any other property *not designed or customarily used for such purposes,* or to sit on any sidewalks or steps, or to lie or sit on any lawns." (*Parr, supra,* 3 Cal.3d at p. 862, italics added.) Thus, *Parr* did not turn on the issue of the "customary" use of the public areas in Carmel, but, as here, on whether a city could prohibit innocuous behavior for the constitutionally impermissible purpose of driving a disfavored group from its bounds. The majority also argue unpersuasively that we must ignore the obvious purpose of the Santa Ana ordinance because, two years previously, Santa Ana had agreed to discontinue attempts to force the homeless to leave. Their approach permits the City to continue to discriminate against the homeless so long as it does not expressly articulate an impermissible purpose. We have explicitly rejected the notion that the mere appearance of neutrality can be used to shield discriminatory legislation. (*Parr, supra,* 3 Cal.3d at p. 870; see also *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529 [50 Cal.Rptr. 881, 413 P.2d 825], affd. *sub nom. Reitman* v. *Mulkey* (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627].)

impermissibly discriminates against the homeless and thereby violates equal protection.[17]

### III. *Right to Travel*

The ordinance also impermissibly penalizes the fundamental right of indigent homeless persons to travel to or remain in Santa Ana, by denying them the basic necessities of sleeping and storing personal belongings in any public areas.

#### a. *Constitutional Freedom to Travel and Abide*

Both the United States Supreme Court and the courts of California have expressly recognized a fundamental constitutional right to travel, "a basic human right protected by the United States and California Constitutions as a whole." (*In re White* (1979) 97 Cal.App.3d 141, 148 [158 Cal.Rptr. 562]; see, e.g., *Shapiro* v. *Thompson, supra*, 394 U.S. at p. 629 [22 L.Ed.2d at p. 612].)[18] A law implicates the right to travel when it either penalizes travel or is intended to impede travel. (*Attorney General of N.Y.* v. *Soto-Lopez, supra*, 476 U.S. at p. 903 [90 L.Ed.2d pp. 905-906] ["A state law implicates the right to travel when it actually deters such travel [citations], when impeding travel is its primary objective [citations], or when it ' "uses any classification which serves to penalize the exercise of that right." ' "].)

The United States Supreme Court has repeatedly rejected statutes de-signed to exclude the indigent. Thus in *Edwards* v. *California* (1941) 314 U.S. 160, 174 [86 L.Ed. 119, 125-126, 62 S.Ct. 164], the court struck down

---

[17]We need not hold, therefore, that homeless persons are members of a "suspect class" in order to invalidate the ordinance on equal protection grounds. As in *Parr, supra*, 3 Cal.3d 861, the purpose of the ordinance—to banish a disfavored group—is plainly not a legitimate state interest. (See also *U. S. Dept. of Agriculture* v. *Moreno* (1973) 413 U.S. 528, 534 [37 L.Ed.2d 782, 787-789, 93 S.Ct. 2821] [invalidating a federal statute that discriminated against "hippies" and "hippie" communes: "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest."]; *Cleburne* v. *Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 448 [87 L.Ed.2d 313, 325-326, 105 S.Ct. 3249] [holding city's denial of building permit invalid because the decision discriminated against the "mentally retarded"].)

[18]Although the Supreme Court has never reached a consensus concerning the specific constitutional source of the right to travel, it has often either relied upon or recognized the equal protection clause as a potential source of the right. (See, e.g., *Shapiro* v. *Thompson, supra*, 394 U.S. at pp. 630, 634 [22 L.Ed.2d at pp. 612-613, 614-615]; *Zobel* v. *Williams* (1982) 457 U.S. 55, 66-67 [72 L.Ed.2d 672, 681-682, 102 S.Ct. 2309] (conc. opn. of Brennan, J.); *Memorial Hospital* v. *Maricopa County* (1974) 415 U.S. 250, 253-270 [39 L.Ed.2d 306, 312-322, 94 S.Ct. 1076]).) " '[T]he right to travel receives its most forceful expression in the context of equal protection analysis.' " (*Attorney General of N.Y.* v. *Soto-Lopez* (1986) 476 U.S. 898, 902, fn. 2 [90 L.Ed.2d 899, 905, 106 S.Ct. 2317], (plur. opn. of Brennan, J.).)

a California statute that prohibited the transportation of indigent nonresidents intò California. The court explained that a community may not "gain a momentary respite from the pressure of events by the simple expedient of shutting its gates to the outside world." (*Id.* at p. 173 [86 L.Ed. at p. 125].) Similarly, in *Shapiro* v. *Thompson, supra,* 394 U.S. at page 629 [22 L.Ed.2d at p. 612], the court held that the right to travel was triggered by any attempt to "fence out" indigents. (See also *Memorial Hospital* v. *Maricopa County, supra,* 415 U.S. 250 [indigents' right to travel and settle in Arizona was impermissibly penalized by durational residency requirements for nonemergency medical care for indigents at county expense].)

The right to travel includes the right to *stay* as well as the right to go. (See, e.g., *Kent* v. *Dulles* (1958) 357 U.S. 116, 126 [2 L.Ed.2d 1204, 1210, 78 S.Ct. 1113] ["Freedom of movement is basic in our scheme of values."]; *Dunn* v. *Blumstein* (1972) 405 U.S. 330, 338 [31 L.Ed.2d 274, 281-282, 92 S.Ct. 995] [right to travel ensures "freedom to enter *and abide*"], italics added; *Attorney General of N.Y.* v. *Soto-Lopez, supra,* 476 U.S. at p. 903 [90 L.Ed.2d at pp. 905-906] [right encompasses burdens on freedom to enter and abide in states]; *Papachristou* v. *City of Jacksonville* (1972) 405 U.S. 156 [31 L.Ed.2d 110, 92 S.Ct. 839] [vagrancy ordinance offends freedom of movement].) Our courts, too, have recognized that the right to travel includes the "concomitant right *not* to travel." (*In re Marriage of McGinnis* (1992) 7 Cal.App.4th 473, 480 [9 Cal.Rptr.2d 182], italics added; see also *In re White, supra,* 97 Cal.App.3d at pp. 148-149 [banishment violates constitutional right to freedom of travel]; *In re Barbak S.* (1993) 18 Cal.App.4th 1077, 1084-1086 [22 Cal.Rptr.2d 893] [same]; *People* v. *Bauer* (1989) 211 Cal.App.3d 937, 944 [260 Cal.Rptr. 62] [same].)

### b. *Intrastate Travel*

This case involves *intra*state travel. In California we have expressly recognized that the constitutional right to freedom of movement necessarily embraces intrastate travel. "[T]he right to intrastate travel (which includes intramunicipal travel) is a basic human right protected by the United States and California Constitutions." (*In re White, supra,* 97 Cal.App.3d at p. 148; see also *In re Marriage of Fingert* (1990) 221 Cal.App.3d 1575, 1581 [271 Cal.Rptr. 389] [court order requiring parent to relocate or lose custody violates right to intrastate travel]; *People* v. *Bauer, supra,* 211 Cal.App.3d at p. 944 [requiring defendant to obtain official approval of choice of residence as a condition of probation impinges on right to intrastate travel].)

The right to intrastate travel in this state is protected without regard to federal decisions on the issue, because the rights guaranteed by the California Constitution " 'are not dependent upon those guaranteed by the United

States Constitution.' " (*In re White, supra,* 97 Cal.App.3d at p. 148.) None-theless, I would approve the holding in *White,* concluding that the United States Constitution ensures the right to intrastate, as well as interstate, travel.

Although the United States Supreme Court has not expressly addressed the right to intrastate travel, it has strongly suggested that such a broad reading of the right to travel is appropriate. Thus in *Kolender* v. *Lawson* (1983) 461 U.S. 352, 358 [75 L.Ed.2d 903, 909-910, 103 S.Ct. 1855], the court emphasized that a law prohibiting wandering the streets at night without identification implicated "consideration of the constitutional right to freedom of movement." (See also *Papachristou* v. *City of Jacksonville, supra,* 405 U.S. at p. 164 [31 L.Ed.2d at pp. 116-117] [" 'wandering or strolling' " are "historically part of the amenities of life as we have known them"].)

The Circuit Courts of Appeal have repeatedly concluded that the right encompasses intrastate travel. (See, e.g., *Spencer* v. *Casavilla* (2d Cir. 1990) 903 F.2d 171, 174; *Lutz* v. *City of York, PA.* (3d Cir. 1990) 899 F.2d 255, 268 ["the right to move freely about one's neighborhood or town . . . is indeed 'implicit in the concept of ordered liberty' and 'deeply rooted in the Nation's history' "]; *King* v. *New Rochelle Municipal Housing Authority* (2d Cir. 1971) 442 F.2d 646, 648-649 [right to travel includes intrastate travel].) As the Second Circuit recognized in *King,* "It would be meaningless to describe the right to travel *between* states as a fundamental precept of personal liberty and not acknowledge a correlative constitutional right to travel *within* a state." (442 F.2d at p. 648, fn. omitted, italics added.)

c. *Impact of the Ordinance*

The majority conclude that the ordinance does not inevitably conflict with the right to travel because it "has no impact, incidental or otherwise, on the right to travel *except* insofar as a person, homeless or not, might be discouraged from traveling to Santa Ana because camping on public property is banned." (Maj. opn., *ante,* p. 1102, italics added.) But homeless persons are not simply "discouraged" from traveling to Santa Ana. They are effectively *prevented* from doing so, because the ordinance forbids them to sleep or store their personal belongings in any public area in the City. By criminal-izing their unavoidable but innocuous conduct of sleeping and storing their personal effects, the ordinance has an immediate impact on the right of the homeless to enter or remain in Santa Ana.[19]

I therefore disagree with the majority's assertion that the effect of the ordinance on the homeless is merely "incidental." Criminalizing the harm-less act of sleeping in a public place—when the vast majority of homeless

---

[19]Even a provision that penalized travel "indirectly" would not be immune from strict constitutional scrutiny. As the Supreme Court stressed in *Dunn* v. *Blumstein, supra,* 405 U.S. at page 341 [31 L.Ed.2d at pp. 283-284]: " ' "Constitutional rights would be of little value

persons in Santa Ana have no legal alternative other than to "get out of town by sundown"—forbids a "necessity of life" and thereby effectively penalizes migration. (See *Memorial Hospital* v. *Maricopa County, supra*, 415 U.S. at pp. 258-259 [39 L.Ed.2d at pp. 314-316] [laws penalize travel when they deny a person a "necessity of life" such as nonemergency medical care for indigents at the county's expense].) Arresting or citing the homeless for sleeping in public also burdens their freedom of movement, because they must either forgo sleep or leave the City altogether to avoid criminal penalty. Moreover, as discussed above, the primary purpose for enforcing the ordinance against the homeless was to drive them out of public areas.[20]

The indirect effects of the ordinance may prove even more invidious. As one amicus curiae, a former mayor, points out, ordinances like Santa Ana's encourage an unhealthy and ultimately futile competition among cities to impose comparable restrictions in order to avoid becoming a refuge for homeless persons driven out by other cities. The case at bar provides a striking example of this domino effect: in response to the Santa Ana ordinance, surrounding communities quickly enacted similar measures to protect themselves from an influx of Santa Ana's homeless.[21] To carry this effect to its logical conclusion, if all communities followed suit the homeless could effectively be excluded from the entire State of California.

In striking down a California law that aimed to exclude the indigent of an earlier era, the Supreme Court observed: "in the words of Mr. Justice Cardozo: 'The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the

---

if they could be . . . indirectly denied.' ' " In *Dunn*, the court invalidated a one-year residential requirement for voting in Tennessee, although there was no evidence that it in fact deterred—or was intended to deter—travel.

[20]The majority's reliance on cases involving only incidental and nondiscriminatory zoning and taxing provisions is therefore misplaced. (See maj. opn., *ante*, p. 1101; *R.H. Macy & Co.* v. *Contra Costa County* (1990) 226 Cal.App.3d 352, 367-369 [276 Cal.Rptr. 530] [unequal taxation under Proposition 13 had an "inconsequential" effect on interstate mobility and did not result in invidious discrimination, either directly or indirectly]; *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 602-603 [135 Cal.Rptr. 41, 557 P.2d 473] [zoning ordinance barring residential construction only incidentally burdened right to travel]; but see *id.* at p. 623 (dis. opn. of Mosk, J.) ["total exclusion of people from a community is both immoral and illegal"].)

[21]Fullerton, Long Beach, and Orange, for example, have passed anticamping ordinances. The City Attorney of Fullerton explained: "We're trying to protect ourselves so that when Santa Ana throws out their 1,300, they don't all come over here." (Schaffer, *Tent Cities: Laws Aim to Break Camp*, Orange County Register (June 7, 1992) pp. 1, 8.) Another amicus curiae, a former mayor of Laguna Beach, similarly observed in a letter to this court: "To the extent that Santa Ana officials 'succeed' [in excluding the homeless], the homeless poor migrate to other nearby cities in search of streets and other public places where they can sleep. Laguna Beach, already 'home' to many poor and homeless individuals, may have to take on yet more of a social support burden."

peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division.' [Citation.] [¶] . . . [¶] . . . [I]n not inconsiderable measure the relief of the needy has become the common responsibility and concern of the whole nation." (*Edwards* v. *State of California, supra,* 314 U.S. at pp. 173-174 [86 L.Ed.2d 124].) The same principle requires us to invalidate the Santa Ana ordinance.

### d. *Strict Scrutiny*

Because the ordinance impairs the right to travel of plaintiffs and other homeless persons, it is subject to strict scrutiny. (See *Dunn* v. *Blumstein, supra,* 405 U.S. at pp. 339-342 [31 L.Ed.2d at pp. 282-284]; *Shapiro* v. *Thompson, supra,* 394 U.S. at p. 634 [22 L.Ed.2d at p. 615]; *Serrano* v. *Priest, supra,* 18 Cal.3d at p. 761; *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 276, fn. 22 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118].) The applicable test, therefore, is whether the ordinance is narrowly tailored to meet a compelling governmental interest. (See *Plyler* v. *Doe* (1982) 457 U.S. 202, 216-217 [72 L.Ed.2d 786, 798-799, 102 S.Ct. 2382].)

The ordinance does not survive under that standard. As stated above, its true underlying purpose—to drive the homeless out of Santa Ana—is not a legitimate governmental interest. But even the more benign, if euphemistic, purpose expressed on the face of the ordinance fails under strict scrutiny.

The ordinance provides: "The public streets and areas within the City [of Santa Ana] should be readily accessible and available to residents and the public at large. The use of these areas for camping purposes or storage of personal property interferes with the rights of others to use the areas for which they were intended [*sic*]. The purpose of this article is to maintain public streets and areas within the city [of Santa Ana] in a clean and accessible condition." (Ord., § 10-400.)

The interests advanced by the City are, in essence, improving the aesthetic appearance of its public areas and maintaining facilities for general public use. These concerns are legitimate and, indeed, "substantial." (See *Clark* v. *Community for Creative Non-Violence* (1984) 468 U.S. 288, 296 [82 L.Ed.2d 221, 228-229, 104 S.Ct. 3065] [governmental interest in maintaining park was "substantial"].) But they are certainly not compelling.

Even if the City's asserted purposes were deemed compelling, moreover, the ordinance would nonetheless fail because it is not narrowly tailored to accomplish its objectives. Santa Ana could certainly maintain public areas in

"a clean and accessible condition" through less restrictive means than citing and arresting homeless persons—under a provision that includes a penalty of six months in jail—for sleeping or storing their personal belongings in public.

As a federal court explained in holding a similar ordinance unconstitutional: "Provision of alternative shelter and services would be the ideal means of accomplishing the same goals. However, in the absence of available shelter space or funds for services, the parks and streets could be cleaned and maintained without arresting the homeless. For example, the City could ask homeless individuals to relocate temporarily to another public area while maintenance crews work on a particular site. It could also establish regular times for each park to be cleaned so that homeless individuals would know not to be in a certain park on a particular day. Instead of arresting homeless individuals for being in the park after hours, the City could allow them to stay in a designated area in exchange for maintaining that area. Similarly, promotion of tourism and business and the development of the downtown area could be accomplished without arresting the homeless for inoffensive conduct." (*Pottinger* v. *City of Miami, supra*, 810 F.Supp. at p. 1582; see also *Clark* v. *Community for Creative Non-Violence, supra*, 468 U.S. 288 [ban on sleeping in Lafayette Park, across the street from the White House, was a reasonable time, place, and manner restriction on expression]; *Joyce* v. *City and County of San Francisco, supra*, 846 F.Supp. 843 [prohibition against sleeping in certain public places at certain times].)

The majority urge that the City has no affirmative constitutional obligation to provide accommodations for the "transient homeless" on or in public property.[22] That does not mean, however, that if the City declines to provide shelters for the homeless it may effectively banish them from all public areas. As long as the homeless have no other place where they may legally sleep and store their personal property in Santa Ana, the City cannot constitutionally prevent them from doing so in public places.

The majority cite with approval a recent district court decision denying preliminary injunctive relief against implementation of the Matrix Program, a San Francisco ordinance addressing the "homeless problem." (*Joyce* v. *City and County of San Francisco, supra*, 846 F.Supp. 843.) Their reliance on *Joyce* is misplaced because the ordinances are crucially dissimilar.

---

[22]In referring generically to the "transient homeless," the majority overlook the fact that plaintiffs include long-term residents of Santa Ana who have lost their residences and jobs. In any event, as discussed above, the right to travel applies both to homeless residents of the City who wish to remain and to "transient" homeless persons who wish to enter and abide in the City.

Unlike Santa Ana's ordinance, the Matrix Program did not involve a total ban on sleeping or storing property in public areas. Indeed, San Francisco police officers were instructed that " '[t]he mere lying or sleeping on or in a bedroll in and of itself does not constitute a violation' . . . ." (*Joyce* v. *City and County of San Francisco, supra,* 846 F.Supp. at p. 861.) Nor did San Francisco attempt to drive the homeless from the city; instead, it provided counseling and referral to local social service programs and attempted to provide temporary housing for the homeless. (*Id.* at pp. 847-848.)[23] The history of Santa Ana's efforts in dealing with the homeless, in sharp contrast, included an official policy of actively *discouraging* existing charitable services for the homeless, including the Salvation Army food program, and a task force directed to drive "vagrants" out of town. In enforcing the ordinance, Santa Ana police officers applied an official policy of citing individuals who were sleeping under blankets.[24]

The City is not required, of course, to open *all* its public spaces at *all* hours to the homeless or to tolerate dangerous or unhealthful conduct. For example, it may enforce existing ordinances against such "camping" behavior as the erection of semipermanent structures, outdoor cooking, and public defecation and urination. It may also enforce existing laws against public drunkenness, drug use, vandalism, assault, theft, and similar misconduct. It may not, however, penalize individuals who have committed only the offense of being without shelter. Sleeping outdoors under a blanket is neither dangerous nor unhealthful to anyone other than the homeless persons who do so as a matter of necessity. Similarly, if the City does not choose to provide storage places for the personal property of the homeless, it may not criminalize their discreet "storage" of personal belongings in public areas.

[23]Thus under the Matrix Program social workers were dispersed throughout the city in order to contact homeless persons and a "Night Shelter Referral Program . . . [was] designed to offer the option of shelter accommodations to those homeless individuals in violation of code sections pertaining to lodging, camping in public parks and sleeping in public parks during prohibited hours." (*Joyce* v. *City and County of San Francisco, supra,* 846 F.Supp. at p. 848.) San Francisco also estimated that in 1993-1994 it would spend $46.4 million for services to the homeless, of which over $8 million was specifically earmarked to provide housing. (*Ibid.*)

[24]The majority also approve *People* v. *Scott* (1993) 20 Cal.App.4th Supp. 5, 13 [26 Cal.Rptr.2d 179], in which the Appellate Department of the Los Angeles Superior Court upheld a West Hollywood anticamping ordinance against a claim that it violated the right to travel of homeless residents. *Scott* offered no case authority to support its conclusory analysis. In any event it is factually distinguishable: there was no claim that the ordinance prohibited sleeping in any public area in West Hollywood and "no evidence [was] presented in this case to support the inference that West Hollywood has used this ordinance to interfere with a person's right to travel or even that it is being enforced in such a way as to drive homeless people out of its community." (*Ibid.*) Nonetheless, I would disapprove *Scott* to the extent that it could be construed to suggest that an ordinance like Santa Ana's, which *is* intended to "drive homeless people out of its community," does not impair the right to travel.

As the Court of Appeal aptly concluded, "The camping ordinance is a butcher knife where a scalpel is required. . . . The city may preclude the erection of structures in public places and it might ban 'camping' in select locations with a properly drafted ordinance, but it may not preclude people who have no place to go from simply living in Santa Ana. And that is what this ordinance is all about."

For all these reasons I would affirm the judgment of the Court of Appeal.